**STATE of Missouri, Respondent,**

v.

**Kenneth BAUMRUK, Appellant.**

**No. SC 88497.**

Supreme Court of Missouri,
En Banc.

March 31, 2009.

Rehearing Denied May 5, 2009.

See also, *State ex rel. Baumruk v. Belt,* 964 S.W.2d 443; *State ex rel. Baumruk v. Seigel,* 150 S.W.3d 286.

602

---

Rosemary E. Percival, Office of Public Defender, Kansas City, MO, for Appellant.

Chris Koster, Atty. Gen., Daniel N. McPherson, Office of Missouri Atty. Gen., Jefferson City, MO, for Respondent.

PATRICIA BRECKENRIDGE, Judge.

Kenneth Baumruk appeals his conviction for first-degree murder and sentence of death. He was convicted of first-degree murder for killing his wife in 1992 at the St. Louis County courthouse. Mr. Baumruk's case was tried by a jury in St. Charles County after a change of venue. On appeal, Mr. Baumruk raises eight separate points alleging the trial court erred in its rulings on various issues, including competency to stand trial, self-representation, a request to obtain a different jury panel, limitations on *voir dire*, juror qualifications, expert reliance on illegally obtained statements, sentencing requirements and closing arguments. Because this case involves the death penalty, this Court has jurisdiction. Mo. Const. art. V, § 3. This Court concludes that no trial court error occurred, and it affirms both the conviction and sentence.

## I. Factual and Procedural History[1]

On May 5, 1992, Mr. Baumruk and his wife, Mary Baumruk, were scheduled for a

hearing in a dissolution of marriage proceeding in the St. Louis County circuit court. Mr. Baumruk carried two .38 caliber handguns in his briefcase to court that day. Prior to the scheduled hearing, the attorney for Mr. Baumruk's wife, Scott Pollard, discovered that he had a conflict of interest because he had represented Mr. Baumruk in a previous case. Before the hearing began, Mr. Pollard told Ms. Baumruk that he represented Mr. Baumruk around 1975, when Mr. Baumruk hired him to modify the dissolution of his first marriage. Mr. Pollard also informed Garry Seltzer, Mr. Baumruk's attorney, of the potential conflict, and the two attorneys met with Judge Samuel Hais in chambers. Judge Hais made a record in open court and determined that the case would proceed only if both Baumruks waived the conflict.

After Judge Hais administered the oath to Mr. and Ms. Baumruk, Mr. Pollard examined Ms. Baumruk regarding the conflict, and she stated that she wanted Mr. Pollard to remain as her attorney. Mr. Baumruk then reached into his briefcase, retrieved the two handguns, stood and shot his wife in the neck. Mr. Baumruk turned toward Mr. Pollard and shot him in the chest. He then shot his own attorney, Mr. Seltzer, in the chest and arm and, when Mr. Seltzer turned to run, Mr. Baumruk shot him in the back. Next, Mr. Baummk walked around the counsel table, put the gun near his wife's head and shot her again, killing her. Judge Hais escaped through the door behind his bench as Mr. Baumruk pursued him.

As Mr. Baummk proceeded with his weapons down the hall outside of the courtroom in search of the judge, bailiff

---

1. Mr. Baumruk was previously tried, convicted and sentenced to death, but his first conviction and sentence were reversed on appeal and the cause was remanded. *State v. Baum-* *ruk*, 85 S.W.3d 644, 651 (Mo. banc 2002) (*Baumruk II*). Portions of the facts are quoted from the opinion in *Baumruk II Id.* at 646–47.

Fred Nicolay pushed a clerk and two attorneys into another judge's chambers, closing and locking the door behind them. Mr. Baummk then shot Mr. Nicolay in the shoulder. Mr. Baummk continued through the courthouse, shooting at two police officers, an investigator and a security officer, wounding only the security officer. Mr. Baummk shot at an additional officer as police officers in the courthouse returned fire, hitting Mr. Baummk nine times, including twice in his head. In sum, Mr. Baummk killed his wife and shot at eight additional people, wounding four, before he was subdued.

Mr. Baummk initially was charged with first-degree murder and multiple counts of first-degree assault and armed criminal action in St. Louis County. He filed a motion for change of venue, which was granted. The case was transferred to Macon County. After a competency hearing, the court there found Mr. Baummk was incompetent to stand trial due to the brain injuries he suffered when shot in the head by police officers. The Macon County court ultimately dismissed the charges against Mr. Baummk. *State ex rel. Baumruk v. Belt*, 964 S.W.2d 443, 443–44 (Mo. banc 1998) (*Baumruk I* ).

The St. Louis County prosecutor subsequently obtained an 18–count indictment, which included a first-degree murder charge for the death of Mary Baummk. Mr. Baummk filed a motion for a change of venue from St. Louis County, which was overruled. Following a 2001 jury trial, Mr. Baumruk was convicted and, in accordance with the jury's recommendation, was sentenced to death. This Court, reversed the judgment and remanded the case with directions to the trial court to grant Mr. Baumruk's motion for change of venue because of pretrial publicity. *State v. Baumruk*, 85 S.W.3d 644, 651 (Mo. banc 2002) (*Baumruk II* ).

On remand, the case was transferred to St. Charles County, where the trial court conducted a competency hearing in June 2005. During this hearing, the trial court heard conflicting expert testimony as to Mr. Baumruk's mental state. Experts for the state presented testimony that Mr. Baumruk was able to consult with his lawyers with a reasonable degree of rational understanding and was able to understand the proceedings against him. Despite the prior dismissal due to a finding of incompetence to stand trial, the trial court found Mr. Baumruk then was competent to stand trial.

Due to the publicity surrounding the case, the court summoned 283 people from St. Charles County to assure access to an unbiased jury. The court divided the potential jurors into three groups to conduct questioning. Defense counsel was allowed to ask potential jurors if they realistically could consider anything less than the death penalty if the evidence showed that Mr. Baumruk not only killed his wife but also shot at other people in the courtroom. The trial court also allowed counsel to indicate during *voir dire* that four other people were shot. The trial court, however, prohibited defense counsel from questioning potential jurors as to whether they could consider the full range of punishment given that Mr. Baumruk attempted to kill eight other people in addition to killing his wife.

Counsel had the opportunity to question members of groups one and two individually. No questioning of group three occurred as there was a sufficient pool from which to draw the jury among the first two groups. Five individuals who received individual questioning sat on the jury, and defense counsel did not attempt to strike any of those five jurors for cause. One of those serving on the jury was Ronald Matlock, who indicated during *voir dire* that

he could not set aside his prior knowledge of the charged crime, could not presume Mr. Baumruk to be innocent and had misgivings about the death penalty. Mr. Matlock did state, however, that he could keep an open mind as to Mr. Baumruk's mental state during the alleged crime.

Mr. Baumruk's trial was held in St. Charles County from January 24 to February 6, 2007. At trial, the issue of Officer Glenn's testimony arose. The state agreed not to present evidence of Mr. Baumruk's statement to Officer Glenn during its case in chief, and defense counsel made no objection to the trial court taking judicial notice of the ruling of competency or to the state's experts' reliance on the statement to Officer Glenn. On completion of the evidence in the guilt phase of the trial, the jury found Mr. Baumruk guilty.

During the state's penalty phase closing argument, the state urged jurors to recommend a death sentence to send a message. The prosecutor argued that Mr. Baumruk "knew what he was doing was wrong, and that he had to plan it to the inth degree so that he could succeed in becoming one of the biggest mass murderers we've ever seen," and asked jurors "[w]hy is it that every time you have one of these acts [such as shooting spree], it must be something about mental disease, mental illness?" The jury found 10 statutory aggravating factors and recommended a death sentence.[2] The trial court ordered the recommended punishment be imposed. Mr. Baumruk appeals this conviction and sentence. Finding no error, this Court affirms both the conviction and sentence.

## II. Standards of Review

■ This Court reviews the evidence presented at a criminal trial in the light most favorable to the verdict. *See State v. Clayton*, 995 S.W.2d 468, 474 (Mo. banc 1999). "The trial court is vested with broad discretion to admit and exclude evidence at trial," and "[e]rror will be found only if this discretion was clearly abused." *State v. Middleton*, 995 S.W.2d 443, 452 (Mo. banc 1999). On direct appeal, this Court reviews claims of trial court error "'for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.'" *State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998) (internal citation omitted).

■ Issues that were not preserved may be reviewed for plain error only, which requires the reviewing court to find that manifest injustice or a miscarriage of justice has resulted from the trial court error. *See State v. Worthington*, 8 S.W.3d 83, 87 (Mo. banc 1999). Review for plain error involves a two-step process. The first step requires a determination of whether the claim of error "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted.'" *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995) (internal citation omitted); Rule 30.20. All prejudicial error, however, is not plain error, and "[p]lain errors are those which are 'evident, obvious, and clear.'" *State v. Scurlock*, 998 S.W.2d 578, 586 (Mo.App.1999) (internal citation omitted). If plain error is found, the court then must proceed to

---

**2.** The jury found that the murder of Ms. Baumruk involved depravity of mind and was outrageously and wantonly vile, horrible and inhuman. The jury also found that Mr. Baumruk, by murdering Ms. Baumruk, knowingly created a great risk of death to more than one person by means of a weapon that normally would be hazardous to the lives of more than one person. The remaining eight aggravating circumstances the jury found were that Ms. Baumruk's murder occurred while Mr. Baumruk was engaged in the attempted commission of unlawful homicides of eight other individuals.

the second step and determine "whether the claimed error resulted in manifest injustice or a miscarriage of justice." *Id.*

## III. Issues Raised on Appeal

On appeal, Mr. Baumruk raises eight separate points alleging trial court error. He alleges the trial court erred in: (A) finding him competent to stand trial; (B) denying him his right to self-representation; (C) denying his request to obtain a pool of potential jurors from outside St. Charles County; (D) imposing improper limitations on *voir dire* by defense counsel; (E) allowing a biased juror to hear the case; (F) allowing experts to rely on an illegally obtained statement; (G) allowing him to be sentenced to death for a crime with which he never was charged; and (H) allowing the prosecutor to make improper closing arguments.

## (A) Competency

Mr. Baumruk contends that the trial court erred in finding him competent to proceed, making him stand trial and sentencing him because he suffers from post-traumatic amnesia as a result of the injuries he suffered when he was shot twice in the head and from the subsequent surgeries to treat those injuries. He asserts that he could not recall his thoughts immediately preceding and during the shootings and, therefore, was unable to assist in his defense or to testify on his behalf and was incompetent to stand trial. Specifically, he argues that his inability to remember his thoughts and emotions before and during the shootings precludes him from assisting his counsel in developing a diminished capacity or insanity defense. Mr. Baumruk criticizes the state's expert testimony that he exaggerated his memory loss of the shooting and that he was able to consult with his lawyers with a reasonable degree of rational understanding and an ability to understand the proceedings against him.

■■■■ "It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the prosecution of a defendant who is not competent to stand trial." *State v. Anderson,* 79 S.W.3d 420, 432 (Mo. banc 2002). "A defendant is competent when he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Id.* (internal quotation marks and citation omitted). A defendant is presumed competent and has the burden of proving incompetence by a preponderance of the evidence. Section 552.020.8, RSMo 2000. Furthermore, "[t]he trial court's determination of competency is one of fact, and must stand unless there is no substantial evidence to support it." *Anderson,* 79 S.W.3d at 433. "In assessing sufficiency of evidence, this Court does not independently weigh the evidence, but accepts as true all evidence and reasonable inferences that tend to support the trial court's finding." *Id.*

■■■■ Mr. Baumruk's sole ground for claiming that the trial court erred in finding him competent to stand trial is that he could not remember his thoughts and emotions immediately before and during the shooting and that this loss of memory makes him incompetent to stand trial because his thoughts and emotions are vital to a diminished capacity or insanity defense. He raised this same claim in the appeal from his first conviction. In its opinion reversing his conviction on other grounds, this Court held that "[e]ven if [Mr.] Baumruk did suffer from amnesia that affected his ability to recall the events surrounding the incident, amnesia does not bar prosecution of an otherwise competent defendant." *Baumruk II,* 85 S.W.3d at

648. A lack of memory of the events surrounding the commission of a crime does not make an individual incompetent to stand trial for the crime. *See id. See also State v. Davis*, 653 S.W.2d 167, 173–74 (Mo. banc 1983) (overruled on other grounds by *Kuyper v. Stone County Comm'n*, 838 S.W.2d 436 (Mo. banc 1992)).

 Before proceeding to trial after remand, the circuit court held a hearing on Mr. Baumruk's claim of incompetency and found him competent. In reaching its decision, the trial court evaluated the evidence before it, including the evidence presented at a prior competency hearing.[3] The trial court heard testimony from experts for both the state and the defense. While the experts disagreed as to Mr. Baumruk's mental state, "a mere disagreement among experts does not necessarily indicate error on the part of the trial court. On the contrary, it is the duty of the trial court to determine which evidence is more credible and persuasive." *Anderson*, 79 S.W.3d at 433 (internal citation omitted). Additionally, the trial court observed Mr. Baumruk's interaction with his lawyers during the hearing. There was substantial evidence to support the trial court's finding that Mr. Baumruk was competent, and this Court defers to the trial court's factual findings.

### (B) Self–Representation

Mr. Baumruk contends that the trial court erred in refusing to allow him to represent himself despite his assertions that he desired to do so. He argues that absent evidence of severe mental illness and a court record supporting such a finding, the trial court's refusal to allow self-representation violates his constitutional rights.

 In support of his claim, Mr. Baumruk relies on the recent opinion of the United States Supreme Court in *Indiana v. Edwards*, —— U.S. ——, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008). In *Edwards*, the Supreme Court addressed the relationship between competence to stand trial and the right to self-representation. *Id.* at 2384. To be competent to stand trial, the defendant must have "a rational as well as factual understanding of the proceedings against him" and have a "present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). In contrast, to elect self-representation, one must "voluntarily and intelligently elect[ ] to do so." *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In *Edwards*, the United States Supreme Court emphasizes that the ability to consult with one's lawyer, as required to establish competence to stand trial, differs significantly from the capacity necessary to represent one's self:

> [T]he nature of the problem before [the United States Supreme Court] cautions against the use of a single mental competency standard for deciding both (1) whether a defendant who is represented by counsel can proceed to trial and (2) whether a defendant who goes to trial must be permitted to represent himself. Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways.... In certain instances an individual may well be able to satisfy [the] mental competence standard, for he will be able to work with counsel at

---

**3.** See *Baumruk II* for a full discussion of the prior competency proceeding. 85 S.W.3d at 648.

trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel.

. . .

Further, proceedings must not only be fair, they must appear fair to all who observe them. . . . [T]he trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant.

*Id.* at 2386–87 (internal quotations and citations omitted).

The Supreme Court also emphasized that a self-representation right at trial should affirm the defendant's dignity. *Id.* at 2387. Self-representation by an individual who lacks the mental capacity to conduct his defense without the assistance of counsel fails to affirm the individual's dignity. "[I]nsofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial." *Id.* As such, "the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." *Id.* at 2387–88. "[T]he Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id.*

Mr. Baumruk was found competent to stand trial, but nonetheless, the trial court denied his request to represent himself.[4] On appeal, Mr. Baumruk argues that the evidence the state presented on the issue of his competency to stand trial proves he did not suffer from a severe mental illness that precluded his self-representation. He also argues that the trial court's ruling was based on factors beyond his mental condition because the trial court, in its ruling, expressed concerns about his self-representation, including that: the trial was one week away; it was a complex proceeding where Mr. Baumruk was facing the ultimate punishment of death; and Mr. Baumruk lacked the ability to perform the functions necessary to represent himself effectively.

In his argument, however, Mr. Baumruk ignores the portion of the record that supports the trial court's ruling, which includes his own arguments and assertions. While the trial court noted circumstances beyond his mental condition when it overruled his motion to proceed without counsel, it also noted several times that Mr. Baumruk was asserting that he was entitled to represent himself while simultaneously arguing that he was incompetent to stand trial. In essence, Mr. Baumruk argued he was so mentally incapacitated that he was unable to stand trial *but* that if he were competent to stand trial, he also would be able to represent himself. As established in *Edwards,* the standard for establishing competency to stand trial is a lower standard than that required to represent oneself. 128 S.Ct. at 2388. As such, Mr. Baumruk presents a false dichot-

---

**4.** Mr. Baumruk was previously found incompetent to stand to trial. "The Macon County circuit court's determination of incompetency does not bar a later claim that Baumruk is competent to stand trial. Nor does the circuit court's finding of competency bar an assertion on Baumruk's behalf, in the trial court after remand, that he is incompetent to stand trial." *Baumruk II,* 85 S.W.3d at 648. Mr. Baumruk's prior determination of incompetency is therefore not controlling. This Court further recognizes that although Mr. Baumruk's cognitive circumstances have improved, he still maintains mental deficits.

omy when asserting that *either* he is incompetent to stand trial *or* he must be competent to represent himself. He disregards a third option, which the trial court here held correctly: that Mr. Baumruk may be sufficiently competent to stand trial but not able to elect self-representation voluntarily and intelligently.

The record is replete with evidence supporting the trial court's decision to deny Mr. Baumruk the right to self-representation. While his claim on appeal that the trial court erred in finding him competent to stand trial is that his inability to remember his thoughts and emotions before and during the shootings precluded him from assisting his counsel in developing a diminished capacity or insanity defense, the evidence before the trial court regarding his mental impairments was more extensive.[5]

Mr. Baumruk himself presented evidence that he suffered permanent brain damage from being shot twice in the head and from the medical treatment of the gunshot injuries. He referred to evidence that the impact of the bullets caused his brain to smack against the side of his skull, injuring the areas of the brain that affect the formation, storage and retrieval of memory. There was evidence that doctors removed the bullet, part of the cerebellum and other irreparably damaged tissue. Mr. Baumruk's brain swelled from excess fluid that "pushe[d] the brain against the skull casing." To alleviate this condition, doctors drilled into his brain and inserted a tube to drain the fluids, causing further damage. He noted that even the state's experts agreed that he suffered

brain damage from the gunshot wounds and surgeries. Mr. Baumruk also argued that one of his experts who opined that Mr. Baumruk was incompetent to stand trial found that Mr. Baumruk had significant memory loss and diminished insight and judgment and concluded that the brain damage caused "personality and memory change which will affect his ability to appreciate the functions of the adversarial system and impair his ability to assist his attorneys in his defense." The trauma to his brain was so severe, in fact, that he initially was held incompetent to stand trial. While Mr. Baumruk presented this information to the trial court in support of his argument that he was, again, incompetent to stand trial, this information was also before the court as it reviewed his self-representation demand.

In addition to the aforementioned medical information, the court reviewed various *pro se* filings by Mr. Baumruk and observed his behavior at numerous pre-trial proceedings, including the pre-trial conference where the court heard his request to represent himself. At that conference, the judge threatened to remove Mr. Baumruk if he continued to have outbursts and to interrupt his counsel. Mr. Baumruk's counsel suggested that Mr. Baumruk's refusal to cooperate with counsel, along with an "irrational obsess[ion]" with relitigating the "memory/amnesia" aspect of his competence to the jury, was the result of his delusional disorder. His counsel expressed concern that his "steadfast but irrational determination to prove to the jury that he was 'justified' in assaulting a

---

5. Mr. Baumruk's motion to discharge his counsel and represent himself was heard at a pretrial conference on January 17, 2007. Earlier in the same pretrial conference, the defense requested that the trial court make a new ruling on Mr. Baumruk's competency to stand trial. In support of Mr. Baumruk's claim that he was not competent, Mr. Baum-

ruk's counsel filed newly prepared reports from a psychologist and psychiatrist wherein those experts expressed their opinions that Mr. Baumruk was incompetent to stand trial at that time. More importantly, he testified at the hearing that he was incompetent to stand trial.

nurse or medical assistant" was the result of a delusional disorder. Within his *pro se* filings, Mr. Baumruk sought to endorse witnesses who lacked any relevance to his trial, including present and former trial judges and medical personnel in the St. Louis County jail.

Because of the trial court's direct exposure to Mr. Baumruk, as well as extensive knowledge of Mr. Baumruk's mental state, the trial court was best able to make fine-tuned mental capacity decisions tailored to Mr. Baumruk's individualized circumstances. *See id.* at 2387. "It is the duty of the trial court to determine which evidence is more credible and persuasive." *Baumruk II*, 85 S.W.3d at 648. "It is the trial court's prerogative to decide whether to believe all, part or none of a witness' testimony." *State v. Morton*, 229 S.W.3d 626, 629 (Mo.App.2007). *See also State v. Styles*, 476 S.W.2d 591, 592 (Mo. 1972) (emphasizing that the credibility of the witnesses is for the determination of the trier of the facts). This Court, therefore, defers to the trial court's conclusions as to Mr. Baumruk's mental state and his ability to represent himself.[6]

Mr. Baumruk, who had been shot twice in the head, suffered severe mental impacts as a result, and such severe results were sufficient to hinder his ability to represent himself. Given the significant evidence before the trial court that Mr. Baumruk, while competent to stand trial, lacked the ability to voluntarily and intelligently elect self-representation, there was no trial court error.

Finally, Mr. Baumruk may not complain about a decision that resulted from his own testimony and evidence. A defendant may not "complain about matters he himself brings into the case." *State v. Crenshaw*, 59 S.W.3d 45, 50 (Mo. App.2001). *See also State v. Fassero*, 256 S.W.3d 109, 118 (Mo. banc 2008) (holding that one may not complain about testimony that was invited by his own questions). Furthermore, the trial court is required to determine that a defendant "does not suffer from a mental incapacity" prior to allowing one to represent himself. *State v. Black*, 223 S.W.3d 149, 156 (Mo. banc 2007). Mr. Baumruk brought into the case many assertions regarding his debilitated mental condition and now seeks to complain when the trial court relies on his evidence. Mr. Baumruk invited and facilitated questions as to his mental ability and, therefore, as to his capacity to elect self-representation voluntarily and intelligently. The trial court must be certain that an individual who suffers from a mental incapacity does not represent himself, and Mr. Baumruk established that he does, in fact, suffer from various mental incapacities. There is no trial court error in the denial of self-representation.

### (C) St. Charles Venire

Mr. Baumruk alleges that the trial court erred in overruling his motion to import a jury from outside St. Charles County to hear his case because the citizens of St. Charles County were exposed to extensive media coverage of the charged crime. He asserts that St. Charles and St. Louis counties constitute one community and, as such, because this Court found a jury from St. Louis County to be unfair, a jury from St. Charles County does not comply with this Court's mandate.

---

**6.** Mr. Baumruk also claims that the trial court erred in not making written findings of fact and conclusions of law in support of its decision overruling his motion for self-representation. There is no requirement that the court make such written findings and, in the absence of such requirement, the reviewing court considers the evidence in the light most favorable to the court's decision.

When evaluating whether to grant or deny a change in venire, the same standards apply as when evaluating whether to grant or deny a change in venue. *See State v. Norman*, 243 S.W.3d 466, 473 (Mo.App.2007). As such, whether to grant or deny a change of venue or venire is within the discretion of the trial court, and the trial court's ruling will be disturbed only in the presence of a clear abuse of discretion. *See Baumruk II*, 85 S.W.3d at 648. When the record shows that "the inhabitants of the county are so prejudiced against the defendant that a fair trial cannot occur in that county," the failure to grant a change of venue or venire constitutes an abuse of discretion. *See id. See also Norman*, 243 S.W.3d at 473.

No requirement exists that "jurors be ignorant of the facts and issues reported by the media." *State v. Johns*, 34 S.W.3d 93, 107 (Mo. banc 2000). "In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Therefore, "the question is not whether the community remembers the case but whether the actual jurors of the case have fixed opinions such that they could not judge impartially whether the defendant was guilty." *Baumruk II*, 85 S.W.3d at 648–49. "There must be a pattern of deep and bitter prejudice or a wave of public passion such that the seating of an impartial jury is impossible." *Id.* at 649 (internal quotation marks and citation omitted). "A change of venue [or venire] is required

when it is necessary to assure the defendant a fair and impartial trial." *Id.*

Here, the trial court summoned a venire panel of 283 individuals. Any venire member who indicated he was aware of the case from outside sources received individual questioning. In addition, the court automatically excused anyone who was aware that Mr. Baumruk had received the death sentence in his prior trial, regardless of whether they indicated they could set aside that information and judge the case solely on the evidence presented at the new trial. Five of the jurors who eventually sat on the jury received individual questioning due to their responses during initial questioning. Of those five, Mr. Baumruk did not seek to strike any for cause. The trial court took steps to secure a fair jury, including summoning a large venire panel and enabling the parties to conduct extensive individual questioning.

Unlike Mr. Baumruk's previous trial, which took place in the same courthouse and in a similar courtroom as the crime itself,[7] the trial here occurred in a different courthouse and different county. Significant media coverage of Mr. Baumruk's case occurred, but none of the jurors who served during his trial had fixed opinions preventing them from judging impartially whether Mr. Baumruk was guilty and, if so, what sentence to recommend. There is no indication in the record that Mr. Baumruk did not receive a fair trial. Whether a different venire might have been preferable is not before this Court, and the use of a venire panel from St. Charles County falls within the discretion of the trial judge.

### (D) *Voir dire*

Mr. Baumruk contends that the trial court abused its discretion by restricting

---

7. This Court stated in *Baumruk II*, "[T]he circumstances of this trial, held where the shootings occurred, are inherently prejudicial

and denied [Mr.] Baumruk his right to a fair trial under the 6th and 14th Amendments." 85 S.W.3d at 649.

defense counsel's *voir dire.* The trial court prohibited defense counsel from questioning venire members as to whether they could consider the full range of punishment given that Mr. Baumruk attempted to kill eight other people in addition to killing his wife. Defense counsel was allowed to ask venire members if they realistically could consider anything less than the death penalty if the evidence showed that Mr. Baumruk not only killed his wife but also shot at other people in the courtroom. The trial court also allowed counsel to indicate during *voir dire* that four other people were shot.

 "A defendant is entitled to a fair and impartial jury." *State v. Oates,* 12 S.W.3d 307, 310 (Mo. banc 2000). While a "necessary component of a guarantee for an impartial jury is an adequate *voir dire* that identifies unqualified jurors[,] . . . the trial judge is vested with the discretion to judge the appropriateness of specific questions, and is generally vested with wide discretion in the conduct of *voir dire.*" *Id.* "The judge is in the best position to determine whether a disclosure of facts on *voir dire* sufficiently assures the defendant of an impartial jury without at the same time amounting to a prejudicial presentation of the evidence." *Id.* at 310–11 (internal quotation marks and citation omitted). Because rulings by the trial court are reviewed only for an abuse of discretion and "[a]n appellate court will find reversible error only where an abuse of discretion is found and the defendant can demonstrate prejudice," Mr. Baumruk "has the burden of showing a 'real probability' that he was prejudiced by the [alleged] abuse." *Id.* at 311.

 "[A]rgument or a presentation of the facts in explicit detail during *voir dire* is inappropriate." *State v. Clark,* 981 S.W.2d 143, 146 (Mo. banc 1998) (internal quotation marks and citation omitted). Even though "[a]n insufficient description

of the facts jeopardizes appellant's right to an impartial jury," *id.* at 147 (internal quotation marks and citation omitted), "[e]very fact need not be disclosed to prospective jurors." *Id.* "Only those critical facts—facts with substantial potential for disqualifying bias—must be divulged to the venire." *Id.*

 The inability of defense counsel to articulate the specific number of individuals at whom Mr. Baumruk shot did not infringe on Mr. Baumruk's right to an impartial jury. Venire members were aware that Mr. Baumruk was charged with shooting his wife, shooting four other people and shooting at other people. The specific number of people is not a critical fact. Furthermore, Mr. Baumruk fails to demonstrate any real probability of prejudice as nothing in the record supports a finding that venire members would have responded differently to the knowledge that Mr. Baumruk shot at eight people as opposed to knowing that Mr. Baumruk shot at people in addition to his wife.

### (E) Juror Matlock

Mr. Baumruk contends that the trial court erred in failing, *sua sponte,* to strike juror Ronald Matlock due to Mr. Matlock's statements during *voir dire* that he was aware of the case due to media coverage at the time of the event. He stated that it was his understanding that a man had shot his wife in a courthouse and that a gun battle ensued. In response to questioning, Mr. Matlock expressed his belief that Mr. Baumruk previously was convicted and that there were numerous witnesses to the shootings. Because of all the witnesses, Mr. Matlock questioned his ability to presume Mr. Baumruk innocent of the crimes. Defense counsel cross-examined Mr. Matlock about his preconceptions:

MR. KENYON: Okay. And then [the prosecutor] also asked you some questions

about your ability to presume, you know, Mr. Baumruk is innocent. You said that you have read a number of things that convince you in your mind that he shot his wife and other people in the courtroom back in 1992; is that correct?

VENIREPERSON MATLOCK: That's correct.

MR. KENYON: Okay. So, have you heard anything at all in the case that had anything to do with what his mental state might have been at that time?

VENIREPERSON MATLOCK: Not that I recall.

MR. KENYON: Okay. When [the prosecutor] asked you if you could presume that he was innocent and if he failed to prove him guilty, if we were to concede that Mr. Baumruk was the one that committed the shooting, but that's a different thing than saying whether or not you can presume him innocent of murder in the first degree. Murder in the first degree requires—well, I'm not, excuse me, I'm not permitted to get into the definition of the crime of murder in the first degree.

Suffice it to say, he has been charged with murder in the first degree and it does involve a mental ailment [sic]. Do you know anything about the mental ailment [sic] of Mr. Baumruk at the time that this crime was committed?

VENIREPERSON MATLOCK: No, I do not.

MR. KENYON: Okay. So, would you be open and able to consider evidence that might be presented to you, if you were a juror on this case that pertained to the mental state of the defendant?

VENIREPERSON MATLOCK: I guess I could. You mean like he just like snapped?

MR. KENYON: That or any other number of things that might be presented with regard to his mental state. And I'm not asking you to tell me whether you think

that that's true or that actually happened in this case. Obviously you have not heard any evidence. All I'm wondering is whether or not, whether or not you would be able to keep an open mind as to those elements, you know, the elements that pertain to his mental state as it relates to the crime of murder in the first degree. If you could keep an open mind about that thing and listen to the evidence and make your own decision about those things.

VENIREPERSON MATLOCK: I guess I could, seeing as how I have not heard anything like that.

MR. KENYON: Fair enough. I don't have any other questions.

Mr. Matlock also was questioned at length about his ability to recommend the death sentence. On his juror questionnaire, Mr. Matlock wrote, "I just could not live with myself knowing that I sent someone to die. I know that it was wrong what a person did, but I could not send them to die." Mr. Matlock repeated this sentiment during questioning and only after significant discussion did Mr. Matlock concede that he could vote for a death sentence under the right circumstances.

 Here, Mr. Baumruk's failure to challenge Mr. Matlock for cause results in a waiver of review. *State v. Wright*, 30 S.W.3d 906, 914 (Mo.App.2000). "The rule requiring contemporaneous objections to the qualifications of jurors is well founded. It serves to minimize the incentive to sandbag in the hope of acquittal and, if unsuccessful, mount a post-conviction attack on the jury selection process." *State v. Hadley*, 815 S.W.2d 422, 423 (Mo. banc 1991). "For that reason, juror challenges made for the first time after a conviction are highly suspect." *Id.* "A clear abuse of discretion and a real probability of injury to the complaining party must be shown, and doubts as to the trial court's finding

that a juror is qualified will be resolved in its favor." *Id.* at 423–24.

Despite this waiver, this Court may consider whether plain error occurred. *Id.* "Relief under the plain error rule is granted only when the alleged error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice inexorably results if left uncorrected." *Id.* at 423. All prejudicial error is not plain error, and "[p]lain errors are [only] those which are evident, obvious, and clear." *Scurlock,* 998 S.W.2d at 586 (internal quotation marks and citation omitted). Only if plain error is found must the court then proceed and determine "whether the claimed error resulted in manifest injustice or a miscarriage of justice." *Id.* at 586.

As such, here, this Court must first determine whether plain error occurred. "[A] trial court is under no duty to strike a juror on its own motion." *Hadley,* 815 S.W.2d at 424. *See also State v. Eastburn,* 950 S.W.2d 595, 598 (Mo.App. 1997). In *State v. Overby,* this Court emphasized that "[t]he absence of any showing by the transcript that the juror was challenged precludes [the Court's] finding that the trial court erred in the respect charged." 432 S.W.2d 277, 279 (Mo.1968). "The trial court was under no duty to strike the juror on its own motion." *Id.* Furthermore, "[t]rial strategy is a significant consideration and such assertions of plain error are normally denied without comment." *State v. Hatcher,* 835 S.W.2d 340, 343 (Mo.App.1992).

Here, defense counsel failed to strike peremptorily Mr. Matlock or seek to strike him for cause. As such, this challenge is highly suspect. *See Hadley,* 815 S.W.2d at 423. The trial court in Mr. Baumruk's proceedings was under no duty to strike Mr. Matlock on its own motion, and, therefore, there was no evident, obvious or clear error. Furthermore, it is reasonable to conclude that defense counsel sought to rehabilitate Mr. Matlock as a viable juror as part of his trial strategy. In reference to another venire member, defense counsel stated that, "[a]s a matter of trial strategy [he] did not request to strike [a different venire member] based on certain responses that she gave on the death penalty, but if [he] didn't have to deal with that issue [of the death penalty] it would have been a strike for cause ... or [he] would have requested a strike for cause otherwise given that she had heard that [Mr. Baumruk] had already been sentenced." As in the case of this other juror, the record would support a motion to strike Mr. Matlock for cause; however, the record also demonstrates that Mr. Matlock had great trepidation over voting for a death sentence. This trepidation over voting for the death penalty would be appealing to defense counsel, and defense counsel could decide, as a trial strategy, not to request a strike for cause. The trial court was under no obligation to interfere with defense counsel's trial strategy and strike Mr. Matlock *sua sponte* and, as such, there was no plain error.

### (F) Officer Glenn's statement

Mr. Baumruk asserts that the trial court plainly erred in overruling his motion to suppress the statement of Officer Glenn in allowing an expert, Dr. Rabun, to rely on Officer Glenn's statement and in failing to bar, *sua sponte,* any expert opinion that relied on that statement. While incarcerated, Mr. Baumruk asserted that his newspapers were stolen and asked to speak to someone. In October 1998, Officer Glenn was assigned to discuss the missing newspapers with Mr. Baumruk. During this discussion, Officer Glenn also asked Mr. Baumruk questions about his wife's murder and the shooting at the courthouse. Officer Glenn never read Mr. Baumruk his rights under *Miranda v. Ari-*

*zona,*[8] and Mr. Baumruk never waived these rights.

Prior to this meeting with Officer Glenn, Dr. Rabun, a psychiatric expert for the state, had determined that Mr. Baumruk suffered from amnestic disorder but had the capacity to understand the proceedings against him and to assist in his defense and, therefore, was competent to stand trial. Dr. Rabun relied on Mr. Baumruk's statements to Officer Glenn, two cellmates and a social worker to conclude that Mr. Baumruk recalled details of the event and did *not* suffer from amnestic disorder. This change in diagnosis had no bearing on Dr. Rabun's conclusion. Both before and after the change in diagnosis, Dr. Rabun concluded that Mr. Baumruk was competent to stand trial.

At trial, the state agreed not to present evidence of Mr. Baumruk's statement to Officer Glenn during its case-in-chief and did not attempt to do so. Defense counsel made no objection to the trial court's taking judicial notice of the trial court's ruling in the competency hearing or to the state's experts' reliance, during rebuttal, on the statement to Officer Glenn.[9]

As there was no objection to the experts' reliance on Mr. Baumruk's statement to Officer Glenn as rebuttal evidence, this Court reviews for plain error. Rule 30.20. Only if the admission of the evidence substantially violated Mr. Baumruk's rights such that a manifest injustice or a miscarriage of justice resulted will this Court overrule the trial court's decision. *Clayton,* 995 S.W.2d at 478.

■ Here, the prosecution did not present Mr. Baumruk's statement to Officer Glenn as evidence of his guilt. Instead, its experts relied on this statement as evidence that Mr. Baumruk remem-

bered the event. "[A]n expert opinion may be based on otherwise inadmissible hearsay evidence." *State v. Woltering,* 810 S.W.2d 584, 586 (Mo.App.1991). During his testimony to rebut Mr. Baumruk's defense that he was not guilty by reason of mental disease or defect, Dr. Rabun did not reveal Mr. Baumruk's statement to Officer Glenn in detail to the jury, only that Mr. Baumruk's discussion with Officer Glenn demonstrated memory of the event. In addition to the statement to Officer Glenn, Mr. Baumruk spoke with two of his cellmates and a social worker. All three of these individuals also stated that Mr. Baumruk provided details of the event that indicated he remembered the shooting itself. Officer Glenn was merely one of four individuals providing support for Dr. Rabun's conclusion that Mr. Baumruk did not suffer from amnestic disorder.

This Court need not consider whether the information was admitted improperly or whether Officer Glenn's actions violated Mr. Baumruk's *Miranda* rights as the evidence of Officer Glenn's conversation with Mr. Baumruk was merely duplicative of other admitted evidence. *See State v. Pennington,* 642 S.W.2d 646, 648 (Mo. 1982). As such, Mr. Baumruk cannot demonstrate any manifest injustice or miscarriage of justice that resulted due to the admission of the information.

### (G) Charging Document

■ Mr. Baumruk asserts that the trial court erred in sentencing him to death because the state failed to plead the aggravating circumstances in the indictment. He argues that statutory aggravators must be included in the charging document so that the offense of aggravated first-degree murder, punishable by death, is distin-

---

**8.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**9.** There was also no objection to the use of this information during the competency hearing.

guished from the offense of non-aggravated first-degree murder, which would have a maximum sentence of life without parole.

Mr. Baumruk acknowledges that this Court has rejected these arguments previously and only raises them for purposes of preservation. Once again, this Court rejects this argument. *See State v. Johnson,* 207 S.W.3d 24, 48 (Mo. banc 2006); *see also State v. Zink,* 181 S.W.3d 66, 75 (Mo. banc 2005). This Court repeatedly has rejected claims that the information or indictment must include statutory aggravators, *Johnson,* 207 S.W.3d at 48, and Mr. Baumruk presents no authority for a holding to the contrary.

### (H) Closing Arguments

Mr. Baumruk contends that the trial court plainly erred in failing to intervene, *sua sponte,* in the state's penalty phase closing argument when the prosecutor: urged jurors to return a death sentence to send a message; argued that Mr. Baumruk "knew what he was doing was wrong, and that he had to plan it to the inth degree so that he could succeed in becoming one of the biggest mass murderers we've ever seen;" and asked jurors, "Why is it that every time you have one of these acts [such as shooting spree], it must be something about mental disease, mental illness?"

Mr. Baumruk's claims are not preserved for review due to counsel's failure to object; as such, the conviction will be reversed based on plain error only if the argument had a decisive effect on the outcome of the trial and amounts to manifest injustice. *State v. Edwards,* 116 S.W.3d 511, 536–37 (Mo. banc 2003). An argument has a decisive effect when it is reasonably probable that, absent the argument, the verdict would have been different. *State v. Kee,* 956 S.W.2d 298, 303 (Mo.App.1997). "Statements made in closing argument rarely constitute plain er-

ror." *State v. Lloyd,* 205 S.W.3d 893, 908 (Mo.App.2006). Without an objection by counsel, a trial court's options are narrowed to uninvited interference with summation, which may itself constitute error. *Id. See also State v. Griffin,* 202 S.W.3d 670, 681 (Mo.App.2006).

Here, in the penalty phase, the jury already had heard all of Mr. Baumruk's actions in preparation for the shooting. The state reiterated those preparations and emphasized his planning. The jury was aware of the number of people shot and injured or killed and the number of people at whom Mr. Baumruk shot but did not wound. The jury already rejected Mr. Baumruk's mental illness defense during the guilt phase. Furthermore, "send a message" arguments are permissible and do not constitute plain error. *State v. Knese,* 985 S.W.2d 759, 775 (Mo. banc 1999). Given the limited nature of the comments during closing argument within the context of the trial as a whole, none of the arguments made during closing argument had a decisive impact on the sentencing recommendation, and no manifest injustice occurred.

### (I) Independent Proportionality Review

Finally, although Mr. Baumruk does not assert that his sentence is disproportionate to his crime, this Court has an independent obligation to conduct a proportionality review, which is intended to ensure against the "wanton" and "freakish" imposition of the death penalty. *Edwards,* 116 S.W.3d at 548–50. Missouri's legislature requires proportionality review in all death penalty cases, requiring this Court to determine:

(1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance ...;

(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Section 565.035.3, RSMo 2000. With regard to the first factor, this Court thoroughly has reviewed the record and concludes that there is nothing in the record to indicate that the punishment imposed was a product of passion, prejudice or any other arbitrary factor.

This Court next reviews the jury's findings to determine if the evidence supports the existence, beyond a reasonable doubt, of aggravating circumstances and any other circumstance found. In this case, the jury unanimously found 10 statutory aggravating circumstances as a basis for considering the death sentence. The evidence showed that Mr. Baumruk brought a weapon to a courthouse, shot his wife twice—the second time at close range while she lay injured and helpless—then shot multiple individuals at close range, shot at multiple individuals in a public location and pursued individuals with a loaded weapon while firing. This evidence supports the jury's finding of all 10 aggravating factors, including: (1) one count that the murder of Ms. Baumruk involved depravity of mind;[10] (2) one count that Mr. Baumruk, by murdering his wife, knowingly created a great risk of death to more than one person by means of a weapon that normally would be hazardous to the lives of more than one person; and (3)

eight counts that the murder occurred while he was engaged in the attempted commission of unlawful homicides of eight other individuals.[11]

Finally, this Court considers whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence and the defendant. In considering whether Mr. Baumruk's sentence of death is excessive or disproportionate in comparison to similar cases, this Court notes that in *State v. Tisius*, this Court found the death penalty was warranted when the defendant shot unarmed victims at close range. 92 S.W.3d 751 (Mo. banc 2002). In *Tisius*, this Court held, "The evidence also supports the jury's finding that the murder of [one individual] was vile, horrible or inhuman in that it involved depravity of mind— [he] was shot several times, at close range, in two separate incidents. During the second incident, [he] was fully conscious and aware that he and his co-worker had been shot." *Id.* at 765. *See also State v. Cole*, 71 S.W.3d 163, 177 (Mo. banc 2002) (recognizing that the death penalty has been found appropriate when "the fatal blow is dealt to the victim while the victim is lying injured and helpless").

Here, the evidence showed that Mr. Baumruk purposely brought two loaded weapons to the judicial proceeding. He shot his wife in the neck, at which point she slumped over in her chair but was not yet dead. He then shot Mr. Pollard in the chest. Next, he shot his own attorney, Mr. Seltzer, with three double bullets that

---

**10.** Jury Instruction No. 17 required the jury to determine "whether the murder of Mary Baumruk involved depravity of mind and whether as a result thereof the murder was outrageously and wantonly vile, horrible and inhuman." In defining "depravity of mind," the jury was required to find "that the defendant killed Mary Baumruk as a part of defen-

dant's plan to kill more than one person, and thereby exhibited a callous disregard for the sanctity of all human life."

**11.** Mr. Baumruk shot and wounded two attorneys, a bailiff and a security guard. He also shot at, but missed, three police officers and an investigator.

each left two wounds.[12] Mr. Baumruk then walked around the counsel table, put the gun near his wife's head and shot her again, killing her. Mr. Baumruk's shooting, at close range, of a helpless and injured individual demonstrates the same vile, horrible and inhuman behavior evident in *Tisius*, which also resulted in the death penalty.

The facts of this case are also similar to those in *State v. Winfield*, where the defendant entered an apartment with a loaded semiautomatic handgun. 5 S.W.3d 505, 516 (Mo. banc 1999). In the course of a shooting spree, he shot three people, two of whom died and the third of whom was blinded permanently. *Id.* He tried to shoot at least one other person, but his weapon was out of rounds. *Id.* The jury concluded that he committed each murder while engaged in the commission of the other, and this Court held that "[n]o doubt existed that everyone in the apartment was put at risk by defendant's shooting spree, including the children." *Id.* Mr. Winfield received the death penalty due to his shooting spree that placed multiple people at risk. *Id.* at 517.

Like Mr. Winfield, Mr. Baumruk went on a shooting spree that endangered a number of persons. He first shot his wife and their two attorneys, shooting his attorney three separate times. Mr. Baumruk then pursued the judge. The judge escaped into an office from a hallway outside the courtroom. After Mr. Baumruk ran out of the courtroom in pursuit of the judge, he shot at a bailiff, whom he wounded, multiple police officers, an investigator and a security officer, who also was wounded. Mr. Baumruk was running toward officers with his weapons when he was shot. He had to be shot multiple times before he dropped both guns. After

killing his wife, Mr. Baumruk did not stop. His acts threatened the lives of numerous other individuals. Like in Mr. Winfield's case, the jury here found that Mr. Baumruk committed the murder while engaged in the commission of other crimes and that he placed multiple people at risk.

When considering the strength of the evidence, it is not disputed that Mr. Baumruk committed the murder as there were numerous witnesses to the event and he was apprehended at the scene when he was shot by officers. There was also strong evidence that he deliberated. When talking about the pending dissolution action to co-workers and friends, Mr. Baumruk made statements that he should shoot his wife and the attorneys. He also made detailed plans for the shooting spree prior to traveling to St. Louis for the dissolution hearing. He purchased two revolvers because they were simpler to operate and less likely to jam. He also purchased "Man Stopper" ammunition. After he was shot and handcuffed, he asked a police officer in a calm voice whether he had killed his wife. Even when he was being treated for his gunshot wounds, Mr. Baumruk told the doctor treating him that he "wanted to shoot that bitch," and the doctor described him as expressing much vehemence and coldness. In light of these circumstances, the imposition of the death penalty was not excessive or disproportionate to the penalty imposed in similar cases.

After considering all the statutory factors, the imposition of the death penalty for Mr. Baumruk's murder conviction was neither wanton nor freakish.

## IV. Conclusion

The judgment is affirmed.

---

12. He received two wounds in the middle of his chest, two through his arm, and two in the back of his left shoulder.

STITH, C.J., PRICE, TEITELMAN, RUSSELL and WOLFF, JJ., concur.
FISCHER, J., not participating.