In the
 Missouri Court of Appeals
 Western District

 
 STATE OF MISSOURI, 
 
 Respondent,  WD83536
 v.  OPINION FILED:
 
 ROBERT J. TABBERER,  JUNE 29, 2021
 
 Appellant. 
 
 

 Appeal from the Circuit Court of Clay County, Missouri
 The Honorable Shane T. Alexander, Judge

 Before Division One: Anthony Rex Gabbert, Presiding Judge,
 Edward R. Ardini, Jr., Judge, Thomas N. Chapman, Judge

 Robert J. Tabberer appeals from a judgment entered upon a jury verdict convicting him of

one count of statutory rape in the first degree, Section 566.032,1 one count of statutory sodomy in

the first degree, Section 566.062, and one count of incest, Section 568.020. Tabberer contends the

circuit court “plainly erred and abused its discretion” in submitting Instruction No. 6, Instruction

No. 8, and Instruction No. 9 to the jury, arguing that the State presented evidence of multiple acts

of alleged sexual intercourse and deviate sexual intercourse, yet the verdict directors did not

specify any one of these incidents, thereby making it unclear for which incidents Tabberer was

 1
 All statutory references are to the Revised Statutes of Missouri as updated through 2016.
found guilty and allowing for the possibility that the jury did not reach unanimous verdicts as to

the same incidents. We affirm.

 Background and Procedural Information

 Tabberer does not challenge the sufficiency of the evidence to support his convictions.

Viewed in the light most favorable to the verdicts, the evidence at trial showed that the victim,

H.T.,2 was born June 16, 2004, to E.D. (Mother) and Tabberer. Although Tabberer lived with

Mother and H.T. for a couple of years after H.T.’s birth, he was “in and out” and did not have a lot

of interaction with H.T.

 Around March of 2014, when H.T. was approximately nine years old, Tabberer moved into

a home Mother and H.T. shared with Mother’s mother at a home in south Kansas City. H.T.

attended school in the Center school district. In the fall of 2015, H.T. began attending Delta Woods

Middle School in the Blue Springs school district. H.T.’s great-grandparents lived in that school

district and Mother thought the change would be positive for H.T. due to concerns of violence and

bullying in the Center school district. H.T. was in the 6th grade in the fall of 2015 and spring of

2016.

 On January 1, 2016, Mother and Tabberer moved to an apartment in Kansas City near the

City of Gladstone in Clay County. H.T. stayed with her great-grandparents during the week and

attended school in Blue Springs, visiting Mother and Tabberer on the weekends and during

holidays and school breaks.

 2
 The record reflects that H.T. was born female and, at the time H.T. was raped and sodomized by Tabberer,
H.T. identified as female. At the time of trial, H.T. had “transitioned” and preferred to be identified as male. H.T.
also legally changed her name. Because H.T. presented as female at the time of the events charged and had the initials
H.T., to avoid confusion we reference H.T. herein by those initials and use female pronouns. No disrespect is intended.

 2
 On April 4, 2017, H.T. disclosed to a school counselor that she had been sexually abused

by Tabberer. On April 26, 2017, twelve-year-old H.T. met with forensic interviewer Sandra

McLaughlin. The interview was recorded and admitted into evidence at trial. During the

interview, H.T. stated that Tabberer began having sexual intercourse with her when she was in the

fourth grade. The abuse began approximately one month after Tabberer moved into the family

home. The abuse stopped half-way between H.T.’s sixth-grade year in school.

 When asked to describe the first time Tabberer had raped her, H.T. stated that she could not

really remember because after it started it just kept happening. H.T. stated that Tabberer initially

did things that made her uncomfortable, such as sitting next to her and touching her leg. H.T.

stated that she did not know how else to describe it, but one day Tabberer just came into her room

and had “sexual intercourse” with her.

 Approximately one month after the sexual intercourse began, H.T. informed Mother.

Mother told H.T. that she was just a “little kid” and did not know what she was talking about. The

abuse continued. When H.T. was in the 5th grade, she told Mother again on two separate occasions.

H.T. asked Mother to say something to Tabberer, make the abuse stop, or kick Tabberer out.

Mother got angry with H.T., yelled at her, and told H.T. that Mother had too much stress on her.

Mother said she was working very hard and did not need to deal with H.T.’s “little bratty

problems.” H.T. apologized to Mother. The final time H.T. reported the abuse to Mother, H.T.

told Mother that H.T. would tell someone else if Mother did not intervene. Mother got “mad” at

H.T. and told H.T. that she did not appreciate Mother. Mother also told H.T. to not tell H.T.’s

grandparents, because her grandparents did not need the “drama.” H.T. stated that she felt that,

because she had told Mother about it and Mother did not care, no one else would care either.

 3
 When H.T. could not recall the first time the sexual intercourse occurred, H.T. was asked

to describe the time she remembered the most. H.T. stated that it was the “last time,” which

occurred halfway through her sixth-grade year in school. H.T. was at the Clay County apartment

Mother and Tabberer lived in. Mother left the home to go pick up H.T.’s grandfather. H.T. then

told Tabberer that she wanted the abuse to stop, and that if he did not leave her alone she would

yell and tell someone. Tabberer then grabbed H.T. by her arms and shoved her on the bed in

Mother and Tabberer’s bedroom. Tabberer began taking H.T.’s clothes off and H.T. started kicking

and trying to escape. Tabberer removed her shirt and bra first, and then her jeans and underwear.

H.T. shouted for help. Tabberer then “raped” H.T. by putting his penis in her vagina and moving

it in and out. H.T. recalled that it was painful. H.T. was on her back facing Tabberer as he held

her arms and wrists down while he raped her. Tabberer did not stop until he heard Mother walking

down the stairs. Tabberer then pulled his penis out of H.T.’s vagina and put his pants back on.

H.T. stated that a “watery substance” came out of Tabberer’s penis and went on the bed. Tabberer

walked out and was talking to Mother. H.T. was worried and crying. She did not want to have the

same conversation she had already had with Mother three times, so H.T. gathered her books and

told Mother that she could not be there anymore and wanted to leave. Mother told H.T. that H.T.

did not care about Mother or her family, and that Mother needed her there to help her. Mother told

H.T. that she was not appreciating her.

 H.T. was asked about whether Tabberer ever had H.T. put her mouth on his body. H.T.

stated that there were “multiple times” Tabberer put his penis in H.T.’s mouth, and that it happened

both at the house and the apartment. H.T. stated that Tabberer would pull on her hair when this

occurred. H.T.’s clothes would be on, Tabberer’s pants would be unzipped, and H.T. would be on

her knees. H.T. stated that when Tabberer did this it would cause her to cough and she could not

 4
breathe. This would also make her feel sick, and she would sometimes throw up. At both the

house they had lived in (Jackson County) and Mother and Tabberer’s apartment (Clay County),

this abuse happened in H.T.’s bedroom. The sexual intercourse happened at the house in the living

room, basement, and H.T.’s bedroom; in the apartment it occurred in H.T.’s bedroom and Mother

and Tabberer’s bedroom.

 H.T. was asked if Tabberer ever used his mouth on H.T.’s body. H.T. reported that he had,

and that Tabberer put his mouth on H.T.’s vagina when she was lying on her bed at both the house

and the apartment.

 H.T. was asked if anyone ever saw the abuse happening or knew it was occurring. H.T.

responded that Mother was sometimes around when H.T. was yelling and screaming and crying

for help. H.T. stated that she did not think a person “couldn’t not hear” the crying and screaming.

H.T. stated that Mother never asked H.T. about it.

 H.T. reported that Tabberer would set up his phone as if he was recording the sexual

encounters between the two.

 H.T. was asked about who she first revealed the abuse to besides Mother. H.T. stated that

she told her great-grandmother. When asked what made her feel safe enough to tell her great-

grandmother, H.T. stated that she did not really feel safe, she was just “sick and exhausted” and

“sleepy and tired” all of the time, did not want to eat and would throw up, kept thinking that she

“couldn’t do this anymore,” and “just kind of lost it.” When she told her great-grandmother,

however, the great-grandmother “shrugged it off.” The next day, her great-grandmother acted as

 5
if she had no memory of the conversation at all.3 During H.T.’s second-hour class in school that

day, H.T. became upset and asked to speak with a counselor. H.T. then disclosed the abuse to the

school counselor. When asked by the forensic interviewer how H.T. felt after talking about the

abuse with someone, H.T. stated that she felt “relief” to get it over with, but at the same time

“regret.” Mother was “mad” at her, told H.T. that she was “putting her through so much,” and that

Mother did not want to have to “deal with authorities.”4

 After the forensic interview of H.T. was shown to the jury, the forensic interviewer, Sandra

McLaughlin, was questioned regarding portions of the video. McLaughlin testified that she found

it difficult to elicit details from H.T. during the interview because H.T. was “very withdrawn” and

 3
 Great-grandmother testified at trial. When Mother dropped H.T. off at Great-grandmother’s home on or
about April 2, 2017, Mother was “upset” and Great-grandmother had an “emotional,” “long discussion” with Mother
during which Mother told Great-grandmother that Mother needed to make some changes and Tabberer needed to move
out. Great-grandmother assured Mother that she would help in any way she could. Around midnight, Great-
grandmother got out of bed to use the bathroom and heard H.T. crying in her room. H.T. told Great-grandmother that
Tabberer had been abusing her. H.T. was “very upset.” Great-grandmother testified that she assumed H.T. meant
yelling, spanking, etc., and told H.T. they would discuss it in the morning. Great-grandmother testified that they did
not discuss it in the morning, as she “figured we would talk about whatever [she] had on [her] mind when [she] got
home from school” so H.T. “went to school as usual.” Great-grandmother received a telephone call from the school
counselor that day advising of H.T.’s disclosure of Tabberer’s sexual abuse.
 4
 Mother testified at trial. Mother denied ever having been informed by H.T. that Tabberer was sexually
abusing her. Mother testified that, when H.T. was about five or six years old, Tabberer watched H.T. one day while
Mother worked. When Mother came home, H.T. was “really upset” and crying and angry. After Mother got H.T.
“calmed down enough,” H.T. told Mother that she had seen her “dad’s penis.” Mother confronted Tabberer who told
Mother he had left the bathroom door open one time. When H.T. was nine years old, H.T.’s great-grandparents told
Mother that H.T. said she had seen Tabberer’s penis. Mother stated that H.T. would not say anything to her about it,
but Mother “confronted” Tabberer who “denied it.”

 H.T. testified on cross-examination at trial that, when H.T. was in the fourth grade, she told Mother that she
had watched a video at school about sexual abuse, “and I told her specifically that I thought I was being sexually
abused and that I wanted to talk to her about it.” H.T. said that she and Mother were pulling out of the driveway to
go to school, and Mother took H.T. out of the car and inside the home where Tabberer was “confronted” and asked if
it was true. When Tabberer denied it, Mother turned to H.T. who “wouldn’t say anything else about it.” H.T. testified
that Mother “then made the conclusion that I had probably just seen something I wasn’t supposed to.” H.T. testified
that she told Mother again at a later date, and Mother told her that it was not true and to not tell H.T.’s grandmother
“because she was afraid that if she found out what I had said, that my dad would get kicked out of the house.” H.T.
testified that when the abuse occurred while Mother was home, H.T. did cry and yell and scream, “but I don’t know
if I was loud enough for her to hear me or not.”

 6
a “challenging interview.” McLaughlin testified that, when a child discloses multiple acts of sexual

abuse, it is difficult for them to determine specific details. The events often run together over time.

McLaughlin indicated that, in interviews with such children, she used “episodic recall” to elicit

more details. She stated:

 When it happens to children over multiple incidents over multiple years,
 like in this case, it’s difficult to parse each one separately. So they’ll talk – that’s
 why I asked specifically, ‘Can you tell me about the time you remember the most,’
 and that way they can give an episodic detail, an episodic event, from the beginning,
 to the middle, to the end, more easily than a time – like the first time. She struggled
 trying to talk about the first time.

 H.T. testified at trial. H.T. stated that, the first couple of months after reporting the sexual

abuse she had to talk to several people, but at the time of trial it had been several months since she

“actually had to talk about it.” She stated that everything she told interviewers and police

investigators at the time she revealed the abuse was true. She testified that she had never been

shown a video of her forensic interview, had never read a synopsis of it, and had never seen any

of the police reports in the case.

 At trial, the State asked H.T. to specifically focus on abuse that occurred in Mother and

Tabberer’s apartment in Clay County. H.T. then testified that there were times when Mother would

leave the apartment “and that turned into him penetrating my vagina with his penis,” but that “most

of the time it would happen at night when my mom was asleep.” H.T. would be sleeping and

Tabberer would come into her bedroom and touch her chest and vagina and ultimately rape her.

Mother’s and Tabberer’s bedroom shared a wall with H.T.’s bedroom.

 7
 When H.T. was asked if Tabberer ever put his penis in her mouth, she testified that he tried

but H.T. would get upset and he would stop. She testified that he touched her lips and mouth with

his penis “slightly, but it never escalated.”5

 H.T. testified that Tabberer touched her vagina with his hand and his mouth.

 When asked how it felt when Tabberer was doing these things to her, H.T. testified that she

would “try to zone out and I really wouldn’t feel anything, but, afterwards, it – I felt, like, just

really grossed out and my body felt like sweaty and disgusting.” When asked how she felt

physically while the abuse was happening, H.T. responded, “Physically, I just felt kind of numb,

because I, like, zoned myself out of it.” When asked if Tabberer ever ejaculated, H.T. testified,

“He would ejaculate, like, onto my stomach or on my thigh, but he never did it inside.” H.T.

testified that, sometimes Tabberer would have his phone out when he did these things and would

either videotape or take pictures. She could not remember the exact date the abuse last occurred,

but thought it was at the end of sixth-grade or the beginning of seventh.

 H.T. was shown a photograph and asked to explain what was depicted in the photograph.

The picture was extracted by police from a cell phone that Mother testified was left behind at the

apartment when Tabberer moved out. Tabberer moved out of the apartment after H.T. revealed

the abuse as Children’s Services would not allow Mother to have contact with H.T. unless Tabberer

was gone. H.T. stated that the photograph was of her and Tabberer sitting on a couch in the home

they resided in before moving to the Clay County apartment. Tabberer was spreading H.T.’s

 5
 Aside from the three counts Tabberer was convicted of, Tabberer was also charged with sodomy for
allegedly inserting his penis in H.T.’s mouth. During deliberations, the jury requested a definition for the word
“insert.” The jury ultimately acquitted Tabberer of this count.

 8
vagina open with his fingers. When asked if the picture was a fair and accurate representation of

what happened that day, H.T. responded, “Yeah. I mean, that’s only part of it, but, yeah.”

 The defense presented no evidence. The defense contended that H.T. was not credible

because some of her statements in the forensic interview contradicted her court testimony. Further,

that H.T. could have learned about sex through friends who found “porno or a Playboy” to look at.

The defense referenced the cartoon South Park stating, “Those kids are nasty. They are eight years

old.”

 The defense further argued that specifics and details were important because Tabberer’s

life was on the line, and H.T.’s testimony that she could not remember details because it happened

so many times was not good enough. The defense pointed out what H.T. did not testify to, stating

that H.T. was never asked to describe Tabberer’s penis by what it looked like, what color it was,

or how it smelled. The defense disputed that the man with H.T. in the “nasty picture” was Tabberer.

The defense stated that, “It does appear to be him, but it’s not,” contending that the man in the

picture could be any boyfriend of Mother and that, people are “attracted to the same type or same

looking type of people.” (The evidence at trial was that Mother had no boyfriend but Tabberer

during the years covering the allegations.)

 The defense agreed that H.T. had “clearly been abused by someone,” but claimed that

Tabberer was falsely accused. The defense contended that H.T. falsely accused Tabberer because

she knew it would get Tabberer out of Mother’s house and/or allow H.T. to stay with her great-

grandparents. (Mother testified that there were no plans for H.T. to move in with her and leave the

great-grandparent’s school district.) The defense argued that, H.T. lied when she said that she told

Mother about the abuse because, if she had told Mother, Mother would have kicked Tabberer out.

The defense argued that H.T. probably believed what she was saying now, because kids can

 9
convince themselves of a lot of things. The defense argued that “[H.T.] is smart. [She’s] in AP

classes. [She] knows how to manipulate people. [She] knows when to change [her] story. And

[she] knows what to say to get someone in trouble.” The defense contended that the evidence

regarding H.T. experiencing depression was perhaps because she did not understand her “gender

identity crisis,” and that “she comes up with this lie because, again, she’s in so much turmoil going

on in her own body and her own mind. She doesn’t know what to do.”

 The jury found Tabberer guilty of one count of statutory rape in the first degree, one count

of statutory sodomy in the first degree involving Tabberer placing his mouth on H.T.’s vagina, and

one count of incest. He was found not guilty of one count of statutory sodomy in the first degree

which alleged that Tabberer inserted his penis in H.T.’s mouth.

 Points on Appeal – Instructional Error

 In Tabberer’s first, second, and third points on appeal, he contends the circuit court “plainly

erred and abused its discretion” in submitting Instruction No. 6, Instruction No. 8, and Instruction

No. 9 (respectively) to the jury, arguing that the State presented evidence of multiple acts of alleged

sexual intercourse and deviate sexual intercourse, yet the verdict directors did not specify any one

of these incidents, thereby making it unclear which incidents Tabberer was found guilty and

allowing for the possibility that the jury did not reach unanimous verdicts as to the same incidents.

 Tabberer made no specific objection to the jury instructions at trial, and did not include the

issues raised on appeal in his motion for new trial. These claims are, therefore, unpreserved.

“Issues that were not preserved may be reviewed for plain error only, which requires the reviewing

court to find that manifest injustice or a miscarriage of justice has resulted from the trial court

error.” State v. Baumruk, 280 S.W.3d 600, 607 (Mo. banc 2009). Review for plain error involves

a two-step process: the first step requires a determination of whether the claim of error facially

 10
establishes substantial grounds for believing that manifest injustice or miscarriage of justice has

resulted; if plain error is found, the court then must proceed to the second step and determine

whether the claimed error resulted in manifest injustice or a miscarriage of justice. Id.; Rule 30.20.

All prejudicial error is not plain error, “and plain errors are those which are evident, obvious and

clear.” Baumruk, 280 S.W.3d at 607 (internal citations and quotation marks omitted).6

 “Instructional error rarely rises to the level of plain error.” State v. Scott, 278 S.W.3d 208,

212 (Mo. App. 2009). For a defendant to establish plain error from an instructional error, he “must

show more than mere prejudice and must show that the circuit court has so misdirected or failed

to instruct the jury that it is apparent to the appellate court that the instructional error affected the

jury’s verdict, and caused manifest injustice or miscarriage of justice.” Id. (internal citation and

quotation marks omitted).

 The Missouri and federal constitutions require that a jury verdict in a criminal case

involving a serious offense be unanimous. MO. CONST. art I, § 22(a); U.S. Const. amend. VI;

 6
 We note that, while State v. Celis-Garcia, 344 S.W.3d 150 (Mo. banc 2011) granted plain error review in a
case involving “multiple acts,” we stated in State v. Adams, 571 S.W.3d 140, 144 n.3 (Mo. App. 2018):

 Though Celis-Garcia found plain error, notwithstanding the defendant’s tender of verdict
 directors that suffered the same defect as those submitted by the state, defendants in future multiple
 acts cases should not presume that they will enjoy a perpetual free pass to secure plain error review
 in these cases. Notwithstanding that the right to a unanimous jury verdict is an important
 constitutional principle, Celis-Garcia has been settled law for several years, rendering it more and
 more difficult to excuse a defendant's failure to object to, and thus preserve, instructional error in
 multiple acts cases.

 Beyond this, in cases such as the one before us that claim a deficiency in the verdict director because distinct,
multiple acts were allegedly before the jury but not particularized in the verdict director, we find that an appellant fails
to establish substantial grounds for believing that manifest injustice has resulted (the first prong of plain error review)
when the appellant generically and/or broadly discusses the entirety of the evidence and the verdict director, but does
not acknowledge narrowed time frames, specific locations, specific acts, etc., already articulated within the verdict
director and identify the particularized, multiple acts occurring within the confines of the verdict director from which
the appellant’s claims emanate. Under plain error review, the appellant still bears the burden of establishing manifest
injustice. State v. Brandolese, 601 S.W.3d 519, 526 (Mo. banc 2020). “It is not the duty of this Court to become an
advocate for the appellant and comb through the entire record searching for the basis of claimed error.” State v.
Bradley, 8 S.W.3d 905, 906 (Mo. App. 2000).

 11
Ramos v. Louisiana, 140 S.Ct. 1390 (2020). “For a jury verdict to be unanimous, the jurors must

be in substantial agreement as to the defendant’s acts, as a preliminary step to determining guilt.”

Celis-Garcia, 344 S.W.3d at 155 (internal quotation marks and citation omitted). The jury

unanimity issue is sometimes raised in “multiple acts” cases. Id. “A multiple acts case arises when

there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a

criminal charge, but the defendant is charged with those acts in a single count.” Id. at 155-56. To

determine if a case is a multiple acts case, courts consider, “(1) whether the acts occur at or near

the same time; (2) whether the acts occur at the same location; (3) whether there is a causal

relationship between the acts, in particular whether there was an intervening event; and (4) whether

there is a fresh impulse motivating some of the conduct.” Id. at 156 (quoting AM.JUR.75B 2D

Trial § 1511).

 Points I and III - Instructions No. 6 and No. 9

 Instruction No. 6 provided that the jury was to find Tabberer guilty of statutory rape in the

first degree if it believed beyond a reasonable doubt that, between January 1, 2016, and May 31,

2016, in Clay County, Missouri, Tabberer had sexual intercourse with H.T., a child less than twelve

years old. Instruction No. 9 provided that the jury was to find Tabberer guilty of incest if it believed

beyond a reasonable doubt that, between January 1, 2016, and May 31, 2016, in Clay County,

Missouri, Tabberer engaged in sexual intercourse with H.T., a child less than fourteen years of age,

who was also a descendant of Tabberer by blood, and Tabberer knew or was aware of this

relationship at the time of the sexual acts. Because Tabberer’s claims of error with regard to

Instructions No. 6 and No. 9 involve the same evidence and require the same analysis, we review

these together.

 12
 The evidence showed that Mother and Tabberer moved into their Clay County apartment

on January 1, 2016, during H.T.’s sixth-grade year in school. Thereafter, H.T. spent weekends and

holidays at the apartment. Although the evidence showed that Tabberer had been raping H.T. for

nearly two years prior to that point, Instructions No. 6 and No. 9 were narrowly tailored to exclude

anything but the Clay County apartment evidence, and focused only on the second half of H.T.’s

sixth-grade year in school – January 1, 2016 through May 31, 2016.

 H.T. was asked to describe the rape incident she remembered the most. She stated that it

was the “last time,” which occurred halfway through her 6th grade year in school. She was at

Mother’s and Tabberer’s apartment. Mother left the apartment to go pick up H.T.’s grandfather.

When H.T. then told Tabberer that she wanted the abuse to stop, and that if he did not leave her

alone she would tell someone, Tabberer grabbed H.T. by her arms and shoved her on the bed in

Mother and Tabberer’s bedroom. Tabberer began taking H.T.’s clothes off and H.T. started kicking

and trying to escape. Tabberer removed her shirt and bra first, and then her jeans and underwear.

H.T. shouted for help. Tabberer then “raped” H.T. by putting his penis in her vagina and moving

it in and out. H.T. recalled that it was painful. H.T. was on her back facing Tabberer as he held

her arms and wrists down. Tabberer did not stop until he heard Mother walking down the stairs.

Tabberer then pulled his penis out of H.T.’s vagina and put his pants back on. H.T. stated that a

“watery substance” came out of Tabberer’s penis and went on the bed. Tabberer walked out and

began talking to Mother. H.T. gathered her school books and told Mother that she could not stay

there anymore and wanted to leave.

 This act of sexual intercourse, described by H.T. in her forensic interview, is the only

distinct act of sexual intercourse particularized in the evidence. At trial, H.T. was asked by the

State to specifically focus on abuse that occurred in Mother and Tabberer’s apartment in Clay

 13
County. She was then asked, “Can you tell me a time that you can remember the most exactly

what your father did to you at the apartment in Clay County?” H.T. testified, “I mean, like, there’s

times where my mom would leave, like, to go to the grocery store or just, like, run errands, and

she left to run errands, and then that turned into him penetrating my vagina with his penis,” but

that “most of the time it would happen at night when my mom was asleep.” H.T. was asked if it

happened “one time or more than one time?” H.T. testified, “More than one time.” H.T. would be

sleeping and Tabberer would come into her bedroom and touch her chest and vagina and ultimately

rape her. H.T. was asked, “Can you tell us about a time that you specifically remember that he

ejaculated? And can you tell us where he ejaculated?” H.T. responded, “He would ejaculate, like,

onto my stomach or on my thigh, but he never did it inside.”

 In closing, the State told the jury that, although there was evidence that Tabberer had sexual

intercourse with H.T. beginning when H.T. was in the fourth grade, “the events that we’re talking

about, though, simply apply to Clay County here … the beginning of 2016 to – to May of 2016.

The State further told the jury when discussing the statutory rape and incest charges:

 And [H.T.] in the interview described how it happened and where. So the
 one – one specific instance that [H.T.] described was – she described her clothing
 coming off in what order. Her shirt came off, bra came off, pants came off, panties
 came off. Describing the positions they were in. Described how he inserted his
 penis into her vagina. Described that it hurt, that he was thrusting, that he was in
 and out. Described ejaculation.

 Although Tabberer disputes the propriety of Instructions No. 6 and No. 9 on the grounds

that “there was evidence that Tabberer had sexual intercourse with H.T. at different times and

places” and that “without some differentiation in the verdict directors, the jury did not know which

specific act it was to consider,” Tabberer points to no multiple, distinct acts of Tabberer having

sexual intercourse with H.T. between the dates of January 1, 2016 and May 31, 2016, that could

 14
have been differentiated in the verdict directors. See Adams, 571 S.W.3d at 150-152. At trial,

while the State asked several questions of H.T. in apparent attempts to evoke “episodic recall” and

draw out testimony regarding specific events, H.T. never discussed any specific event and only

spoke in generalities regarding plural events. In reviewing the record, we find only one incident

that was discussed with particularity – the incident H.T. discusses in the forensic interview when

asked about the time she could remember the most. Consequently, there is no reasonable

likelihood that the jury could have been confused with regard to which specific incident of sexual

intercourse the jury was agreeing Tabberer engaged in with H.T. where there was only one specific

incident in evidence.

 We disagree with Tabberer that the facts of his case are similar to those in State v. Celis-

Garcia, 344 S.W.3d 150 (Mo. banc 2011), and State v. Powell, 581 S.W.3d 103 (Mo. App. 2019).

In Celis-Garcia, the verdict director directed the jury to find the defendant guilty if it believed the

defendant or her boyfriend placed her or his hand on the child’s genitals during a thirteen-month

time frame. Celis-Garcia, 344 S.W.3d at 154-155. There were two alleged victims. The evidence

at trial was that there were four specific incidents of the defendant and her boyfriend touching one

victim’s genitals – once on an enclosed back porch, three to four days later in a bedroom, an

incident in a bathroom, and an incident where the victim was first removed from a bathroom and

then taken to the back porch with a sibling. Id. at 156. With regard to the second alleged victim,

there was evidence of three incidents – once in the defendant’s bedroom, once in a shed, and once

in a bathroom. Id. The Celis-Garcia court found that the “broad language” of the verdict director

“allowed each individual juror to determine which incident he or she would consider in finding

Ms. Celis-Garcia guilty of statutory sodomy.” Id. Consequently, the defendant’s right to a

unanimous jury verdict was violated. Id. at 158.

 15
 In Powell, this court found that there was evidence presented of “at least two specific

incidents of Powell touching Victim’s genitals – one in the bathroom while Victim was

showering/bathing and one in Powell’s bedroom when he was putting lotion on Victim.” 581

S.W.3d at 108. The verdict director required the jury to find that the defendant had touched the

genitals of the victim during a four-month time frame, but did not differentiate between either of

the specific incidents in evidence. Id. We determined that, “[b]ecause the verdict director failed

to sufficiently identify the act the jurors were to agree he committed, it violated Powell’s

constitutional right to a unanimous jury verdict and was, on its face, plainly erroneous.” Id.

 In both Celis-Garcia and Powell, multiple, distinct acts of sodomy occurring in separately

identifiable locations were in evidence. This is not the case here. Only one distinct act of rape

was discussed with any particularity in Tabberer’s trial. Because the evidence did not describe

multiple, particularized incidents of rape, Instructions No. 6 and No 9 did not evidently, obviously,

or clearly affect Tabberer’s right to a unanimous verdict. Adams, 571 S.W.3d at 152.

 Further, even if the generic evidence of multiple rapes in conjunction with the

particularized evidence regarding the incident H.T. recalled the most warranted more specifically

identifying the most memorable incident in the verdict director,7 Tabberer has not established that

the trial court’s failure to sua sponte do so affected the verdict. See State v. Escobar, 523 S.W.3d

545, 552-553 (Mo. App. 2017). While H.T. stated generally that repeated rapes occurred, and

occurred at the Clay County apartment in both H.T.’s bedroom and Mother and Tabberer’s

bedroom, H.T. described in detail the incident she could remember the most and the State focused

 7
 Given the evidence, the verdict director could not have specifically described separate criminal acts, with
the jury being instructed that it must unanimously agree that at least one of those acts occurred (as suggested in Celis-
Garcia as an alternate way “to address the unanimity problem in cases regarding multiple acts”) because only the rape
H.T. remembered the most was specifically described in the evidence. See Celis-Garcia, 344 S.W.3d at 157.

 16
on this incident in closing. Although Tabberer contends that he did not present an incident-specific

defense and generally denied all of the allegations, this is not quite accurate. While he did

generally deny all allegations, he specifically discussed the incident H.T. stated in the forensic

interview that she recalled the most when arguing in closing that evidentiary inconsistencies

showed the State had not proven its case beyond a reasonable doubt. Tabberer described H.T.’s

explanation of this incident from the forensic interview and argued that H.T. testified to something

different at trial – a “hand job” that was “not in the forensic interview” and that Tabberer had not

been charged with. Moreover, despite Tabberer’s argument on appeal that there were multiple,

distinct acts of sexual intercourse in evidence that required differentiation in the verdict directors,

the only incident of sexual intercourse focused on at trial was the incident H.T. described in the

forensic interview.8

 Of note, H.T.’s trial testimony regarding whether Tabberer inserted his penis in H.T.’s

mouth undoubtedly conflicted with her forensic interview. In the forensic interview, H.T.

described that Tabberer put his penis in her mouth and it would go “in and out.” It made H.T.

cough and feel like she could not breathe. It happened in her bedroom. She was on her knees

during these incidents and he was standing. At trial, H.T. was asked to specifically focus on events

that occurred in Clay County. When asked if Tabberer ever put his penis in her mouth, H.T. stated

that he “tried” but H.T. would get upset and he would stop. When asked if he touched her lips or

mouth with his penis, she stated, “slightly, but it never escalated.”

 8
 Tabberer, in fact, criticized H.T. in closing for her inability to remember more specifics, contending that
his life was on the line, that “specifics” and “details” are important, and to say “she just doesn’t remember because it
happened so many times, not good enough. Not good enough.”

 17
 The jury’s acquittal of Tabberer on the charge of sodomy for inserting his penis in H.T.’s

mouth supports that the jury found H.T. credible. The acquittal does not necessarily mean,

however, that the jury found H.T.’s conflicting forensic interview statements to lack credibility, as

Tabberer contends. Tabberer emphasized to the jury that evidentiary inconsistencies created

reasonable doubt. The jury might have simply agreed with Tabberer and determined that H.T.’s

trial testimony raised enough reasonable doubt about the charge that an acquittal was most

appropriate.9

 The jury ultimately concluded, unanimously, that Tabberer was guilty of rape, incest, and

sodomy (for placing his mouth on H.T.’s vagina), but not guilty of sodomy (for inserting his penis

in H.T.’s mouth). These convictions, along with the acquittal, show that the jury found H.T.

credible, believed H.T.’s trial testimony, and disregarded Tabberer’s claim that H.T. fabricated the

allegations and that more details were necessary to prove Tabberer committed the crimes they

found him guilty of. Given the evidence and arguments by both sides at trial, there is no reasonable

likelihood that Instructions No. 6 and No. 9 allowed for individual jurors to convict on separate

acts of sexual intercourse.

 We conclude that, because the record reveals only one particularized act of sexual

intercourse occurring between Tabberer and H.T. in Clay County, Missouri between the dates of

January 1, 2016 and May 31, 2016, Tabberer fails to make a threshold showing that plain error

occurred when the court submitted Instructions No. 6 and No. 9 to the jury. Further, even if the

generic evidence of multiple rapes in conjunction with the particularized evidence regarding the

 9
 The jury came back once from deliberations with a question as to whether there was a legal definition for
“inserted.” The jury came back again advising that it had “decided for three counts, but one of the counts we are
undecided.” The jury was sent back with instructions to “continue deliberating in accordance with the Court’s
instructions until you have reached unanimous verdicts as to each of the four counts submitted to you.”

 18
incident H.T. recalled the most warranted more specifically identifying this incident in the verdict

director, Tabberer has not established a reasonable likelihood that any error by the trial court in

failing to sua sponte do so affected the verdict.

 Points I and III are denied.

 Point II - Instruction No. 8

 Instruction No. 8 provided that the jury was to find Tabberer guilty of statutory sodomy in

the first degree if it believed beyond a reasonable doubt that, between January 1, 2016, and May

31, 2016, in Clay County, Missouri, Tabberer knowingly placed his mouth on H.T.’s vagina, that

such conduct constituted deviate sexual intercourse, and that H.T. was a child less than twelve

years old. “Deviate sexual intercourse” was defined for the jury in Instruction No. 10 as:

 [A]ny act involving the genitals of one person and the hand, mouth, tongue, or anus
 of another person or a sexual act involving the penetration, however slight, of the
 male or female sex organ or the anus by a finger, instrument or object done for the
 purpose of arousing or gratifying the sexual desire of any person.

 Tabberer contends that “the State presented evidence of multiple acts of mouth-to-vagina

contact, on different dates, in different locations” and that the verdict director failed to “specify

which act, in which location, the jurors should consider.” Yet, Tabberer describes none of these

purported particularized, multiple, mouth-to-vagina acts to support this claim. The record shows

that, after H.T. described in the forensic interview that Tabberer put his penis in H.T.’s mouth, H.T.

was asked if “there was ever a time that he used his mouth on your body.” H.T. responded, “Yes.”

The interviewer then asked, “Tell me about that.” H.T. stated, “Um, there was one time where he

would do it on my vagina.” When asked which residence this occurred, H.T. responded, “Both

times, I was at my house and my apartment.” At trial, H.T. was asked to specifically focus on

events occurring at the Clay County residence and at one point was asked, “Did he ever touch your

 19
vagina with any other part of his body?” H.T. responded, “With his hand and his mouth.” This is

the extent of the evidence regarding mouth-to-vagina contact.

 We find that the evidence, at most, reveals only two separate acts of Tabberer placing his

mouth on H.T.’s vagina. It can be reasonably inferred that when H.T. states in the forensic

interview, “Both times, I was at my house and my apartment,” that she is referencing one act at

each location. Regardless, there is certainly no evidence of any particularized acts of mouth-to-

vagina contact occurring more than once at the apartment residence. Instruction No. 8 was

narrowly tailored to exclude any acts that occurred outside of the Clay County apartment residence.

The January 1, 2016, to May 31, 2016, time frame encompasses acts occurring only at the

apartment. The jury could not have been confused, therefore, with regard to which specific

incident of mouth- to-vagina contact the jury was agreeing Tabberer engaged in with H.T. when

there was only one specific incident in evidence that occurred between January 1, 2016 and May

31, 2016, in Clay County.

 We conclude that Tabberer fails to make a threshold showing that the circuit court plainly

erred in submitting Instruction No. 8 to the jury. Although Tabberer claims that there was evidence

at trial of multiple, particularized acts of Tabberer placing his mouth on H.T.’s vagina between the

dates of January 1, 2016 and May 31, 2016, and that the court should have sua sponte specified

one of these acts in the verdict director, Tabberer details none of these alleged multiple,

particularized acts on appeal. Tabberer, consequently, fails to show that an instruction drafted

more specifically than Instruction No 8 was necessitated by the evidence.

 Point II is denied.

 Conclusion

 The circuit court’s judgment is affirmed.

 20
 Anthony Rex Gabbert, Judge

All concur.

 21