

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| Respondent, | ) |
| | ) |
| | )   **WD86173** |
| v. | )   **OPINION FILED:** |
| | )   **FEBRUARY 25, 2025** |
| JONATHAN PHILIPPE, | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Platte County, Missouri**
**The Honorable W. Ann Hansbrough, Judge**

**Before Division Four: Anthony Rex Gabbert, Chief Judge, Presiding,**
**Karen King Mitchell, Judge, Jerri J. Zhang, Special Judge**

Jonathan Philippe appeals the circuit court's judgment, entered on a jury verdict, convicting him of two counts of statutory sodomy in the first degree, one count of attempted enticement of a child, and one count of child molestation in the third degree. He raises six points of alleged error. In his first point, he contends the circuit court erred in permitting out-of-court hearsay statements of the minor victim ("Victim") to be admitted into evidence. In his second through fifth points, he contends the circuit court plainly erred in submitting instructions to the jury that failed to differentiate between multiple acts of the same crime. In his sixth point, he contends the circuit court erred in

overruling his motion for new trial based on his claim that the State improperly communicated with the jury during its deliberation. We affirm.

## Background and Procedural Information

The sufficiency of the evidence to support the verdicts is not in dispute. In the light most favorable to the verdict, the trial evidence showed that Victim was born in Haiti in 2006, and lived with her mother ("Mother") in Haiti until she was nine years old. She then came to live with her father ("Father") in the United States, as both parents believed the United States would provide her more opportunities and a better life. Victim lived with Father for approximately a year and a half, but the arrangement did not go well because Victim's stepmother was "not happy" with Victim, which resulted in Victim's unhappiness and difficulties for Father.

Father was friends with Philippe through their church, and he told Philippe about these troubles. Philippe offered to take Victim into his home if his wife ("Wife") agreed, but time passed and nothing materialized. Father ultimately left Victim with Mother in Haiti when Father took Victim with him on a mission trip to Haiti that he and Philippe went on. Wife was surprised when Victim did not return home with Father and offered to take her in. Victim returned to the United States a few months later and began residing in the Philippe household in December of 2017. She was eleven years old.

When Victim moved in, Philippe's household included Philippe, Wife, their three children, and Philippe's mother-in-law ("Grandma"). A few months later, a woman named J.B. and her three children moved in. J.B. and Philippe's wife were best friends

2

and had met at church. When J.B. and her husband began having financial and marital difficulties, Philippe and his wife offered for them to stay in their home. J.B.'s husband did not end up living in the Philippe household, and J.B. and her husband eventually divorced. The Philippe home was spacious, and there were four bedrooms in the basement. J.B. and her children shared a bedroom in the basement. Victim initially shared a bedroom with Grandma, but later had a room to herself. Philippe's and Wife's son also had a bedroom in the basement.

J.B. testified at trial that, in February of 2020, J.B. and Wife noticed Victim with a twenty-dollar bill. This was unusual, and both J.B. and Wife asked Victim about it. Victim told Wife that she had "earned" it. When asked how, Victim responded, "I don't know. Ask [Philippe]." J.B. found this response odd, so a few hours later approached the topic again. Victim initially said something about a "bet" which involved whether she would have a boyfriend by a certain age. J.B. told her that she was too young to be talking about boyfriends and should be focusing on school. Victim then said, "Can I tell you something?" J.B. knew something was wrong, and sensing that Victim was about to tell her something important, J.B. turned on the record function on her phone and recorded the conversation. Victim was unaware she was being recorded. In addition to the February 2020 recordings, J.B. subsequently recorded two additional conversations, one the following day and one approximately a month later.

J.B.'s audio recordings were played for the jury at trial. In the first recording Victim told J.B. that, on the night Wife took an exam and everyone went to bed early,

3

Philippe came into her room, woke her up, told her he wanted to show her something, and asked her to close her eyes. He put something in her mouth, and asked her how it tasted. She said it tasted like nothing. Philippe asked her what was in her mouth, and she said she thought it was his private part. Philippe asked if she wanted to do it again, and she said no. Philippe then told her it was a test, and that she had passed.

J.B. asked Victim if Philippe had done it again, and Victim responded that he had done it the previous Friday. Victim said that she had come out of the shower, and Philippe came into Grandma's bathroom and said he wanted to show her something. Philippe put his mouth on Victim's breasts, and then lifted her feet and put his mouth on her private part. After that, Philippe put his private part in Victim's mouth again. Victim was crying and shaking, and Philippe apologized and said he would not do it again. Victim told Philippe that he had a wife and it was not ok to do those things to Victim. Philippe gave Victim the twenty dollars after that Friday night incident.

J.B. arranged to talk to Victim at her school the following day during Victim's lunch hour. J.B. again recorded the conversation. Victim reiterated that the first time Philippe sexually assaulted her was when Wife was taking a test, but Victim's description of this incident was slightly different. Before that night, Victim believed Philippe would often enter her room and watch her sleep, but nothing else happened. On the night Wife was taking a test, Philippe woke Victim up, said he wanted to show her something, and asked her to suck his private part. Victim did. She stated that nothing came out of it.

4

Victim again explained the incident which had occurred the prior Friday.  Victim was exiting the shower in the downstairs bathroom, and Philippe tried to remove her towel.  Victim said that Philippe told her he wanted to show her something, and lifted her feet and put his mouth on her private, or her vagina, and he licked it.  Victim said this felt weird.  Victim said that Philippe did not put his private in her private.  Victim also told J.B. that Philippe would come to her room and touch her breasts while she was putting clothes on.

J.B. told Victim that it was "not ok" that Philippe did those things, and if he did it again, to tell J.B.  J.B. emphasized that Victim should not tell Philippe or anyone else that Victim spoke to J.B., because they would both be in danger.  J.B. told Victim that J.B. would "take care of it."

About a month later (approximately March 6, 2020), Victim again told J.B. about an encounter with Philippe.  Victim said that she was sleeping and felt someone pull down her pants.  Victim felt someone put something in her private part and move it back and forth.  Victim did not know what it was.  When Victim lifted her head, the person left.  This conversation was not recorded.

J.B. testified that she bought a hidden camera to place in Victim's room after her initial disclosure to J.B.  Although the camera recorded some periods of time between March 27 through March 31, it did not capture anything of evidentiary value.

J.B. had a close relationship with her sister who lived in Texas and J.B. informed her of the abuse Victim had disclosed.  J.B. finally decided to call law enforcement

5

because the abuse was happening more frequently, and she and her sister made the call on April 2, 2020.

Early in the morning on April 3, 2020, police came to Philippe's home. Victim testified at trial that, Wife handed Grandma's phone to Victim, and Philippe asked Victim if she had told anyone. Victim told him that she had not. Philippe told her that she was ruining lives and to go upstairs and tell the police that nothing happened. Victim stated that she would. Victim's father picked Victim up from Philippe's home for Victim's forensic interview on April 3, 2020.

Victim's forensic interview was played for the jury at trial. During the interview, she recounted much of the same information she had previously reported to J.B. Victim told the interviewer that Philippe had been touching her. During the first incident, Philippe came into her room and told her he wanted to show her something. He asked her to keep her eyes closed and open her mouth. He then put something in her mouth and asked her how it tasted. Victim realized at that point that Philippe had put his private part in her mouth. Victim stated that she did not worry too much after this incident because Philippe told her afterward that it was just a test.

Victim also described the incident in which she was in the bathroom and Philippe came in. She had her towel on and he said he wanted to show her something. She told him no, but he said it would be really quick. He put his mouth on her breasts and used his mouth on her private parts. He asked how it felt. He then followed her into her room and she put her pajamas on. She sat down on her bed with her Chromebook. He told her

that since he had done something for her, she needed to do something for him. He told her to open her mouth and she told him she did not want to and repeatedly told him no. He put his hands on her jaw and put his private inside her mouth, but she did not suck on it. He told her she was doing a good job. She pushed herself away.

Victim mentioned a time in her bedroom where she got up off the floor and sat on her bed. Philippe told her to lay down and she told him no. She pushed him away and started crying, asking him why he was doing that because he was a doctor and a Christian and what if she told her dad. He said he was doing it because he liked her. Victim told him that was why he had a wife; he had married her and he had kids. He asked why she would tell her father, and she said that if he did not want her to, that meant he was doing something wrong. He asked if she was going to tell, and she said she did not know. He left the room.

Victim reported being given twenty dollars by Philippe because she "passed the test." He tried to hug her. He asked to be forgiven and said it would not happen again. After that, he came into her bedroom and pulled her pants down while she was sleeping and moved something back and forth in her private part. She was not sure if it was his hand or what it was. He frequently came into her room and tried to put his private part in her mouth while she was sleeping.

Victim told the forensic interviewer that, often when she was in the kitchen making breakfast, or getting snacks for the kids, Philippe would touch her "butt." One time she told him it was weird, and he asked her how. She said she did not know. He

7

told her that she was supposed to trust people she lived with. He then mentioned his two daughters and asked if they thought it was weird when he touched them on the butts. She told him no. He reiterated that she should trust people she lived with.

Victim discussed with the interviewers how Grandma told her that Victim was a loud talker around Grandma, but soft spoken around Philippe. Victim described being given the twenty dollars by Philippe and being asked about it by Wife. When that occurred, some household members were watching television, including Philippe, and Wife asked Philippe how Victim earned the twenty dollars. He told her that Victim passed a test. Wife asked what test, and Philippe attempted to change the subject, asking for some "Ranch" for a salad Wife had given him. Victim knew that Wife would not let the topic drop, so Victim told Wife she passed a social studies test.

Victim told the interviewer that J.B. had also asked her about the money Philippe had given her, and Victim later asked J.B. if she could tell her something. J.B. was on her phone at the time, and started paying attention when Victim began disclosing what Philippe had done. J.B. told her that it was not okay for someone to touch Victim in that manner, and that she was supposed to tell someone. Victim stated that J.B. purchased an alarm clock camera and put it in Victim's bedroom, but the camera did not end up working because she believed the wi-fi signal was not working at night.

The forensic interviewer asked additional questions about the first time Philippe molested Victim, and Victim provided more details. She stated that the other children

had cameras on their room, but she did not have a camera on hers. Victim also labeled various body parts on anatomical drawings provided by the interviewer.

The interviewer questioned her and she again described the "one time" that Philippe had touched her breasts and sucked on them in the bathroom. Victim tried to push him away and he asked her how it felt. She told him nothing. She tried to push him away and he pushed her hand and lifted her foot up and licked her private part. Victim stated that it felt weird. Victim stated that Philippe then went in her room and told her she needed to "do it back to him." She told him she did not want to and had not asked him to do that to her. He then told her to get on her knees and asked her, "Why do you have that face?" He told her to open her mouth. Victim stated that everyone else was home and upstairs. These things happened more than one time. The interviewer asked if Philippe had ever put his private part anywhere else on her body, and Victim stated that one night she was sleeping and he pulled her pants down. She was not sure if it was his private part or his hand, but he put something in her private part.

The interviewer asked Victim if Philippe had given her anything other than the money. She stated that he gave her a letter under her door. The letter said that she passed the test, except for one thing…she had not pushed him away. She told him that she had pushed him the whole time but he would not stop. Philippe later called her on the phone and asked her about the letter.

In response to questions from the interviewer, Victim stated that she had told a thirteen-year-old school friend about the abuse prior to disclosing to J.B., and the school

9

friend believed that, because Philippe and Wife were "strict," they might test her in that manner. Victim reported then telling J.B., who told her that it was bad that was happening to her.

The interviewer asked Victim if Philippe responded when Victim mentioned to Philippe about telling her dad about the abuse. Victim stated that Philippe asked why she would tell her father, and that if she told anyone it would affect multiple lives. When he told her that, Victim thought that if Philippe went to jail, Wife (whom she called "Mommy") would have to get a job and work really hard.

Victim said that after the first incident, he promised it would never happen again. Victim stated that, on the day of the forensic interview, Philippe had come into her room at 12:36 that morning. He pulled her pants down and tried to touch her private part. She pushed him away and he did not touch her private part. Then he tried to touch her breasts, and she pushed him away and he "did not manage to, like, put his mouth on it." Then he tried to touch her with his private part but "didn't manage to do anything." J.B. had told Victim to yell if it happened again to alert everyone in the house. Victim told him to leave her alone, but did not scream it out. Philippe then went upstairs. About an hour later, J.B. noticed Victim's door open and asked Victim if Philippe had been to her room. Victim told her that she was not confident enough to scream. When Victim later woke up that morning, the police were upstairs.

Victim was asked if there was ever anything different about the times Philippe came into her room. She indicated, "not really," and then discussed that he often tried to

10

do something to her before trying to put his penis in her mouth. He would only have a towel on when he came into her room at night. Grandma had put a light in Victim's room, but it got broken somehow. J.B. then put lights in the room, but he turned those off. It was dark in her room so she often could not see anything.

Victim was asked by the interviewer about when he would touch her "butt." She talked about a time when they were cleaning the garage. Victim was asked if Philippe ever did anything else that made her feel uncomfortable. She stated that once she was watching Netflix and a two-year-old female child was there. Philippe put his mouth on her "boobs" and sucked on them, and the child said "do it again, do it again," and he did. When Philippe left, Victim told the child that she should not ask Philippe to do that. Victim reported this incident to J.B., whom she believes then called her sister.

When asked if anyone else had ever done anything to make her feel uncomfortable, Victim reported that older cousins in Haiti had sexually abused her. She told a female cousin, and her aunt told them to not do it again and it did not happen again. She did not recall how old she was when that happened.

Victim testified at trial to many of the same testimonies she had previously spoken to J.B. and the forensic interviewer about, and testified in more detail to some of that information. Regarding the incident where Philippe asked her to get on her knees in her bedroom, she stated that he put his penis in her mouth on that occasion. When these incidents occurred, Philippe would carry his camera with him and could see other portions of the home through the video surveillance cameras.

Philippe testified in his own defense at trial. His defense was that J.B. was motivated to lie because approximately one year prior to Victim's allegations surfacing, Philippe and J.B. began having a sexual relationship when they were on a medical mission trip in Haiti. Philippe testified that, they continued the affair upon returning home and would meet at hotels. Their last sexual encounter was the weekend before Thanksgiving, 2019. He stated that J.B. asked him to leave his wife, and he told her that he did not want to do that and that the affair should stop. He also told her that she needed to get a job and save money because she was going to need to leave the house. Philippe testified that J.B. was upset and told him, "You're going to regret this." Philippe stated that his communications with J.B. occurred via Snapchat.

Philippe also testified that he never abused Victim. In closing, the defense stated that it did not know if J.B. manipulated Victim into making the allegations, or if Victim had very "vivid dreams" and a "wild imagination like children so often have," and enjoyed all of the attention she was getting from adults regarding the allegations. The defense argued that J.B. involved her sister in reporting the incident so her sister would give her a place to stay, because J.B. "needed the next person to mooch off of."

The jury found Philippe guilty of all counts, and recommended sentences of ten years each on the statutory sodomy counts, seven years on the attempted child enticement count, and three years on the child molestation count. The trial court accepted those recommendations, with the sodomy counts to run consecutively, and the attempted

enticement and molestation counts to run concurrent with each other but consecutive to the sodomy sentences.

This appeal follows.

### Point I – Admission of Recordings

In his first point on appeal, Philippe contends the circuit court erred as a matter of law in permitting out-of-court hearsay statements of Victim to be admitted into evidence under Sections 491.075 and 492.304.[1] Although other evidence was admitted at trial pursuant to Sections 491.075 and 492.304, Philippe appears to only challenge the admission of the video recording of the forensic interview, and J.B.'s audio recordings of Victim's statements.[2] He argues the recordings made by J.B. were not reliable because J.B. was not experienced or professional at conducting interviews, talked to Victim in a leading manner, and both she and Victim had a reason to fabricate. Philippe argues as to the recording of the forensic interview, that no one advised the forensic interviewer of J.B.'s prior interviews with Victim.

We review a circuit court's decision to admit a child's out-of-court-statements for abuse of discretion. *State v. Antle*, 670 S.W.3d 66, 71 (Mo. App. 2023). A circuit court has broad discretion to admit or exclude evidence at trial, and abuses its discretion when

---

[1]All statutory references are to the Revised Statutes of Missouri, as updated through 2019, unless otherwise noted.

[2]Philippe raised pre-trial objections to direct testimony by J.B., direct testimony by the forensic interviewer, and direct testimony by a Children's Mercy Hospital nurse, but made no objections at trial to this evidence.

its findings are not supported by substantial evidence in the record. *Id.* The circuit court abuses its discretion when its ruling is clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.*

<u>Forensic Interview - Video Recording</u>

Section 492.304 provides that the visual and aural recording of a verbal or nonverbal statement of a child under the age of fourteen, who is alleged to be a victim of an offense under the provisions of chapter 565, 566 or 568, is admissible into evidence if:

(1) No attorney for either party was present when the statement was made; except that, for any statement taken at a state-funded child assessment center as provided for in subsection 2 of section 210.001, an attorney representing the state of Missouri in a criminal investigation may, as a member of a multidisciplinary investigation team, observe the taking of such statement, but such attorney shall not be present in the room where the interview is being conducted;

(2) The recording is both visual and aural and is recorded on film or videotape or by other electronic means;

(3) The recording equipment was capable of making an accurate recording, the operator of the equipment was competent, and the recording is accurate and has not been altered;

(4) The statement was not made in response to questioning calculated to lead the child to make a particular statement or to act in a particular way;

(5) Every voice on the recording is identified;

(6) The person conducting the interview of the child in the recording is present at the proceeding and available to testify or be cross-examined by either party; and

(7) The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence.

§ 492.304.1.

Prior to trial, the State filed a notice of intent to offer into evidence the visual and aural recording of Victim's forensic interview pursuant to Section 492.304. Therein, the State set forth how it believed the videotaped recording of the interview met the criteria for admission set forth in Section 492.304.

In opposition, at a hearing on January 13, 2023, Philippe argued that the authenticity of the forensic interview was compromised because the forensic interviewer was not made aware that Victim had already been "interviewed by a non-professional," J.B., three times. Defense counsel additionally stated, "maybe that comes to the credibility at trial, more of a credibility argument than a 491 argument—is that she wasn't given all the facts prior to interviewing [Victim] like she was supposed to be getting." Philippe did not discuss the criteria for admission set forth in Section 492.304, or how the recording was inadmissible under that criteria.

The State presented the forensic interviewer's testimony and submitted the videotape of the forensic interview for the court's review. The court took the matter under advisement, later ruling that the forensic interview "has the appropriate validity under 492.304 to be admissible in this case."

At trial, the State offered State's Exhibit Number 14, the forensic interview, into evidence during the forensic interviewer's testimony. Defense counsel did not object to

the forensic interviewer's testimony, but renewed the objections made at the "491 hearing" as to State's Exhibit Number 14. The court overruled the objection and admitted the exhibit.

In his motion for new trial, Philippe argued the trial court "erred by allowing the State to use the evidence requested during the 491 hearing over the Defendant's objection." Philippe stated: "The defendant hereby renews his objections and arguments made during the 491 hearing held on January 13, 2023." Philippe did not specifically identify which pieces of evidence he believed should have been excluded from evidence at trial.

On appeal, Philippe quotes Section 492.304 and bolds criteria (4) which requires, "the statement not be made in response to questioning calculated to lead the child to make a particular statement or to act in a particular way." Philippe makes no arguments, however, as to how the questions in Victim's forensic interview were calculated to lead Victim to make a particular statement or to act in a particular way. Nor does he discuss any other Section 492.304 criteria to explain how the video of the forensic interview did not qualify for admission into evidence under the statute.

After quoting Section 492.304, Philippe discusses the totality-of-the-circumstances test that is used when considering the reliability of a child's out-of-court statement for admission into evidence under Section 491.075. *See State v. Antle*, 657 S.W.3d 221, 228 (Mo. App. 2021). Section 491.075, however, is expressly applicable to

16

a statement "not otherwise admissible by statute or court rule[.]" The forensic interview was admitted under Section 492.304.

Philippe simply supplies nothing to support that the trial court erred in admitting the video recording of the forensic interview under Section 492.304. Even if his claim (that J.B.'s discussions with Victim tainted the forensic interview because the forensic interviewer was unaware of Victim's disclosures to J.B.) could negate any of the admission criteria set forth in Section 492.304, there would still need to be some showing that Victim's initial disclosures to J.B. lacked reliability. As discussed below, the record does not support that Victim's recorded disclosures to J.B. lacked reliability.

### J.B.'s Audio Recordings of Victim's Disclosures

Prior to trial, pursuant to Section 491.075, the State filed a notice of intent to offer into evidence J.B.'s testimony regarding Victim's disclosures to her, the aural recordings J.B. made of Victim discussing Philippe's sexual conduct, the testimony of the forensic interviewer regarding Victim's disclosures, and the testimony of a Children's Mercy Hospital nurse regarding Victim's disclosures. Therein, the State argued that the various testimony regarding Victim's disclosures, and the recordings J.B. made of Victim disclosing Philippe's abuse, met the statutory criteria set forth in Section 491.075 and provided sufficient indicia of reliability for admission into evidence.

At the 491 Hearing on January 13, 2023, the State presented J.B.'s testimony and the recordings for the court's review. As relevant to this appeal, in opposition to J.B.'s

17

recordings of Victim, Philippe argued that J.B.'s questions to Victim were "very leading" and failed to meet the indicia of reliability necessary for admission.

The court took the matter under advisement. In ruling on the issue, the court referenced J.B.'s testimony and stated that the court had listened to the audio recordings. The court concluded that the time, contents, and circumstances provided sufficient indicia of reliability for admission into evidence. The court found it significant that J.B. first inquired about the $20 bill in Victim's possession, and Victim stated that she had "earned" it. After some time passed, Victim then approached J.B. and asked if she could talk to her. The court found that the circumstances surrounding the disclosure gave a "lot of indicia of reliability on that information in that recording." The court found admission of the recordings "appropriate based upon the statute 491.075 and my analysis of that."

At trial, Philippe did not object to J.B.'s testimony. During J.B.'s testimony, the State offered the audio recordings of Victim's statements to J.B. into evidence. Defense counsel renewed the objection made at the 491 hearing as to State's Exhibit Number 12. The court overruled the objection and admitted the exhibit.

In his motion for new trial, Philippe alleged the trial court "erred by allowing the State to use the evidence requested during the 491 hearing over the Defendant's objection," and that, "The defendant hereby renews his objections and arguments made during the 491 hearing held on January 13, 2023." Philippe did not specifically identify which pieces of evidence he believed should have been excluded from evidence at trial.

Section 491.075 provides, in relevant part:

1. A statement made by a child under the age of fourteen, or a vulnerable person, relating to an offense under chapter 565, 566, 568 or 573, performed by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:

   (1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

   (2) (a) The child or vulnerable person testifies at the proceedings;

   ….

§ 491.075.1.  In making the reliability determination required by Section 491.075.1(1), courts apply a totality-of-the-circumstances test.  *Antle*, 670 S.W.3d at 71.  Several non-exclusive factors are considered, such as:

> (1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) lack of a motive to fabricate; and (4) knowledge of subject matter unexpected of a child of similar age.  Other important facts include the lapse of time between when the acts occurred and when the victim reported them and the technique employed by the interviewer.

*Id.* (internal quotation marks and citations omitted).

On appeal, Philippe discusses these non-exclusive factors and appears to concede that the recordings show spontaneity and consistent repetition, but argues, nevertheless, that the remaining factors show the court erred in admitting J.B.'s recordings of Victim.  Defendant contends Victim had a motive to lie, arguing she wanted to return to her mother in Haiti.  Further, that Victim wanted to get away from the Philippe home where feces had been smeared on her belongings.  Philippe contends Victim had prior

19

knowledge of sexual subject matter because she was sexually abused by male cousins. Philippe further argues that J.B. conducted multiple interviews of Victim, used leading questions and suggestive techniques, used an aggressive tone, repeated questions when not satisfied with Victim's answer, and supplied Victim with specific words to use.

Philippe's arguments are not supported by the record. There is no evidence that Victim wanted to return to Mother in Haiti, or that Victim wanted to leave the Philippe home because feces was smeared on her belongings. Victim testified that she was happy when she was able to return to the United States and live with the Philippe family. Victim testified that Wife was nice to her, and that Victim got along with other children in the home "for the most part". Victim was asked on cross-examination by the defense about a time feces was smeared on Victim's belongings by another child in the home. Victim recalled the incident and stated that the responsible child never admitted doing it. There was no further evidence on that topic.

Victim was also asked on cross examination if she ever stated that she missed her mother and thought it might be better to move back to Haiti. Victim stated that she never recalled saying that she would like to move back. Defense counsel asked if it would refresh her memory to look at her deposition. Victim stated that it would, however defense counsel stated that she would "get back to that," and never showed Victim the deposition where she allegedly made that statement. Later, defense counsel referenced counsel's prior question to Victim about whether she had mentioned in a deposition about

20

going back to Haiti, and asked if she had ever stated that. Victim replied, "No," and defense counsel asked no more questions on the topic.

Defense counsel then asked Victim questions regarding her mental state and whether Victim had ever felt suicidal, to which Victim testified that, during the time Phillipe was abusing her, she did feel like she wished to kill herself. She testified: "I was kind of, like, asking myself—like, they took me in, and they were being, like, really nice. And it would be better if I, like, didn't exist at all because I felt like I was ruining something. And that was – like, kept – that's what I kept in my head." On redirect-examination, Victim was asked about why she stated that she wished she did not exist. Victim testified:

> Well, I mean, like – I mean, like, I wasn't really close to anyone, like I said, like any adults or anything. And it made me, like – it made me feel that there's like – if I would – if I wasn't there, like, nothing would have happened. They would've been fine and nothing – I guess nothing would have been happening. Like, this whole thing wouldn't happen. Well, like, I didn't know if, like, the police would be involved in it. But, like, at that time, I felt, like, really upset at myself because he wouldn't be touching me if I wasn't there in the house at all. So it kind of, like, made me feel like, if I wasn't here, he wouldn't been – like he wouldn't be doing those [sic] stuff. He would've just been fine with his family and stuff. So – yeah.

Regarding the victim's sexual knowledge unexpected of a child of similar age, Philippe states that Victim "did have sexual knowledge unexpected of a child of similar age," but argues that Victim had this knowledge prior to ever meeting Philippe because she was sexually abused by male cousins and, therefore, "would know what to say whether defendant had abused her or not." Yet, the account of Victim's abuse by cousins

21

was discussed by Victim in her recorded discussions with J.B., as well as in her videotaped forensic interview.  The abuse by her cousins occurred in Haiti when she was much younger, and she could not recall her age.  She reported the abuse to a female cousin, and Mother was informed.  Everyone got spanked, including Victim.  Nothing about Victim's account of the abuse by cousins in Haiti is similar to her accounts of Philippe's abuse, which are accompanied by very specific details from what appear to be spontaneous, unprompted recollections.

The circuit court did not abuse its discretion in concluding that the time, content, and circumstances of J.B.'s recordings provide sufficient indicia of reliability for admission.  The recordings progress in a manner that one might expect, with the first being an initial disclosure, the second being a follow-up discussion after the initial disclosure, and the third being a report of a new and separate incident.  The questions asked by J.B. in the first audio appear natural for a concerned adult just learning that a child was being subjected to abuse.  The concerned, hushed tones and types of questions asked by J.B., such as where J.B. and the rest of the family were when these events were happening, lend credibility to J.B.'s testimony about how the recording came about.  J.B.'s first recording actually consists of very little questioning from J.B., and primarily consists of Victim providing a narrative of what Philippe had done to her, with J.B. periodically requesting clarification.

The second recording occurred the day after J.B. was first made aware of the abuse, and J.B.'s tone and questions seem reasonable for an adult having had a day to

22

reflect upon the previous day's disclosures, understanding the gravity of situation. J.B. uses a very serious, direct tone throughout the conversation, beginning the conversation with a directive that Victim not tell Philippe or Wife that she had disclosed the abuse to J.B. She reiterates later in the conversation that, if she tells Philippe that she told someone, it could put them all in danger. Victim was to report to J.B. if anything further happened, and if Philippe (who they discussed was "always watching the cameras") saw them talking and asked about it, Victim would say they were discussing school. While J.B.'s tone is indeed serious, she uses the same tone throughout the entire conversation, including when she tells Victim that it is not okay that Philippe is doing those things to her, that she is only one year older than one of his own children, that Victim could talk to J.B. if it happened again, that J.B. would make sure it does not happen again, and that J.B. loved her.

While Philippe contends that J.B. uses "textbook leading questions" in the second recording, that recording was made after Victim had explained, unprompted the day prior, about Philippe's abuse and gave specifics as to what occurred, including locations where the abuse occurred. J.B. clarifies in the second recording the locations of the abuse that Victim had explained the day prior. J.B. asked Victim if she sucked Philippe's penis after he put it in her mouth, and Victim replied that Philippe asked her to. We disagree with Philippe's statement on appeal that J.B. then asked Victim three times in a row if "anything came out of him," with Victim repeatedly saying no. J.B. asked, "Did anything come out of him when he asked you to suck it?" There was a pause, which was different

23

than Victim's immediate responses to other inquiries. J.B. stated, "You can tell me the truth. You are not going to get in trouble. Hmm?" It appears Victim then states, "I don't think…no," with the tone of her voice sounding unsure. J.B. states, "Okay." There is another pause and J.B. says, "Hmm?" again. Victim replies, "No," and immediately discusses an encounter where Philippe asked her to do it again and told her he would buy her anything she wanted.

The circuit court did not abuse its discretion in admitting the video recording of Victim's forensic interview, pursuant to Section 492.304, or in admitting J.B.'s audio recordings of Victim's disclosures, pursuant to Section 491.075.

Point I is denied.

## Points II, III, IV, V – Unanimous Verdict

In Philippe's second, third, fourth, and fifth points on appeal, he contends the circuit court plainly erred in submitting Instruction No. 7, Instruction No. 6, Instruction No. 9, and Instruction No. 8 (respectively) to the jury, arguing that the State presented evidence of multiple acts of sodomy (Instructions No. 7 and No. 6), child molestation (Instruction No. 9), and attempted enticement (Instruction No. 8), yet the verdict directors did not differentiate between which of the multiple acts the jury was to consider, thereby depriving Philippe of his constitutional right to a unanimous verdict on each conviction.

Philippe agreed to the format and wording of the jury instructions submitted at trial, and concedes that his claims of error are unpreserved. He requests plain error review. "Issues that were not preserved may be reviewed for plain error only, which

24

requires the reviewing court to find that manifest injustice or a miscarriage of justice has resulted from the trial court error." *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009). Review for plain error involves a two-step process: the first step requires a determination of whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted; if such is found, the court then must proceed to the second step and determine whether the claimed error resulted in manifest injustice or a miscarriage of justice. *Id.*; Rule 30.20. All prejudicial error is not plain error, "and plain errors are those which are evident, obvious and clear." *Baumruk*, 280 S.W.3d at 607 (internal citations and quotation marks omitted).

"Instructional error rarely rises to the level of plain error." *State v. Scott*, 278 S.W.3d 208, 212 (Mo. App. 2009). For a defendant to establish plain error from an instructional error, he "must show more than mere prejudice and must show that the circuit court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict, and caused manifest injustice or miscarriage of justice." *Id.* (internal citation and quotation marks omitted).

The Missouri and federal constitutions require that a jury verdict in a criminal case involving a serious offense be unanimous. MO. CONST. art I, § 22(a); U.S. Const. amend. VI; *Ramos v. Louisiana*, ––– U.S. ––––, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020). "For a jury verdict to be unanimous, the jurors must be in substantial agreement as to the defendant's acts, as a preliminary step to determining guilt." *State v. Celis-Garcia*, 344 S.W.3d 150, 155 (Mo. banc 2011) (internal quotation marks and citation

25

omitted). The jury unanimity issue is sometimes raised in "multiple acts" cases. *Id.* "A multiple acts case arises when there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a criminal charge, but the defendant is charged with those acts in a single count." *Id.* at 155-56. To determine if a case is a multiple acts case, courts consider, "'(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct.'" *Id.* at 156 (quoting AM.JUR.75B 2D *Trial* § 1511).

*State v. Celis-Garcia* explained that a defendant's right to a unanimous verdict is protected in a multiple acts case by "either the state (1) electing the particular criminal act on which it will rely to support the charge or (2) the verdict director specifically describing the separate criminal acts presented to the jury and the jury being instructed that it must agree unanimously that at least one of those acts occurred." 344 S.W.3d at 157.

We note that, while *Celis-Garcia* granted plain error review in a case involving "multiple acts" *thirteen years ago*, we stated in *State v. Adams*, 571 S.W.3d 140, 144 n.3 (Mo. App. 2018), *six years ago*:

> Though *Celis-Garcia* found plain error, notwithstanding the defendant's tender of verdict directors that suffered the same defect as those submitted by the state, defendants in future multiple acts cases should not presume that they will enjoy a perpetual free pass to secure plain error review in these cases. Notwithstanding that the right to a unanimous jury

26

verdict is an important constitutional principle, *Celis-Garcia* has been settled law for several years, rendering it more and more difficult to excuse a defendant's failure to object to, and thus preserve, instructional error in multiple acts cases.

Here, the parties knew before trial there would be at least two distinct acts of penis to mouth contact in evidence (discussed below), because two distinct incidents were discussed in the forensic interview, which the court ruled nearly two weeks before trial would be allowed into evidence. Rule 28.03 requires that counsel make specific objections to instructions or verdict forms considered erroneous, and that "[n]o party may assign as error the giving or failure to give instructions or verdict forms unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." The objections must also be raised in the motion for new trial.

Such circumstances certainly suggest that the failure to object could have been motivated by trial strategy, particularly when *Celis Garcia* and other cases discuss the type of defense to lodge that will support a finding of manifest justice. Nevertheless, as we discussed in *State v. Gannan*, 658 S.W.3d 103, 110, (Mo. App. 2022), we are bound by Missouri Supreme Court precedent which continues to grant plain error review in multiple acts cases with verdict directors that allegedly deprive the defendant of a unanimous verdict.

27

## Point II:  Instruction No. 7 – Penis to Mouth Statutory Sodomy

In his second point on appeal, Philippe contends the circuit court plainly erred in submitting Instruction No. 7 on penis to mouth statutory sodomy. Philippe argues the instruction submitted failed to differentiate between which multiple acts of penis to mouth sodomy occurred, and there were multiple acts of penis to mouth sodomy discussed in different locations in the evidence, thereby depriving him of a unanimous verdict.

Instruction No. 7 provided that the jury was to find Philippe guilty of statutory sodomy in the first degree if it found that, between April 1, 2019, and April 2, 2020, in the State of Missouri, Philippe knowingly had deviate sexual intercourse with Victim, a child less than fourteen years old, by placing his penis in her mouth.  "Deviate sexual intercourse" was defined for that instruction as any act involving the genitals of one person and the mouth of another person done for the purpose of arousing or gratifying the sexual desire of any person.

The evidence shows that Philippe placed his penis in Victim's mouth on more than one occasion.  Although Victim stated that this happened numerous times, there were two distinguishable instances in evidence.  Victim disclosed that the first time Philippe touched her inappropriately, he came into her bedroom when she was sleeping, woke her up, asked her to close her eyes, and put his penis in her mouth.  Victim described a separate instance of penis to mouth conduct that occurred following Philippe putting his mouth on her breasts and vagina when she exited the shower.  Philippe then followed her

28

to her bedroom, had her get on her knees, and he put his penis in her mouth. Each of these distinct criminal acts could have served as the basis for finding Philippe guilty under Instruction No. 7.

Given that the verdict director did not specifically describe which penis to mouth incident was being submitted, and the jury could have convicted Philippe based on the first penis to mouth incident or the after-shower penis to mouth incident, the verdict director was erroneous. "Having determined the trial court erred by failing to correctly instruct the jury, it is necessary to determine whether that error resulted in manifest injustice or a miscarriage of justice, thereby warranting reversal." *Celis-Garcia*, 344 S.W.3d at 158.

Philippe first argues that, because the verdict director did nothing to distinguish which of the two distinguishable acts of penis to mouth sodomy was specifically charged, and did not instruct the jury that they must agree on the specific act committed, the "plainly erroneous verdict director created a jury free-for-all that resulted in manifest injustice by negating Philippe's constitutional right to a unanimous jury verdict." Yet, this argument simply describes the standard for finding the verdict director erroneous; it does not address how the verdict director affected the jury's verdict in this case.

Second, Philippe acknowledges that an issue frequently discussed when determining if manifest injustice or a miscarriage of justice occurred is the type of defense strategy used during trial. "Relevant, but not determinative to this inquiry, is the nature of the defense mounted by [Philippe] at trial." *State v. Escobar*, 523 S.W.3d 545,

29

at 551 (Mo. App. 2017). In *Celis-Garcia*, the Court found that plain error rose to the level of manifest injustice when the defendant "sought to exploit factual inconsistencies and raise doubts about the plausibility of the specific incidents of statutory sodomy[.]" 344 S.W.3d at 158. *Celis-Garcia* distinguished this defense strategy from statutory sodomy cases "in which the defense simply argues that the victims fabricated their stories." *Id*.

Philippe contends that, although he denied that any events occurred, he also used a specific-incident strategy by going "one-by-one through each incident and illustrat[ing] the inconsistencies with each story." Philippe states that he also attacked the quality of the investigation done by police, the lack of DNA evidence, missing key witnesses, and leading questions in the forensic interview. Further, he argues the State only broadly went through the elements of the charge during its closing argument, merely providing the conclusory statement that the elements were met based on Victim's testimony, but did not discuss the incidents specifically.

In reviewing the record, the State very simply argued to the jury for each count that, if the jury believed Victim, the elements for that charge were met. "As I said in the beginning, if you believe her, he is guilty of all charges. He knows that. Everyone in the courtroom knows that." "Ladies and gentlemen, I told you, in the beginning, that this comes down to the idea of who's telling the truth. And that is something that you decide…Do you believe [Victim] or not?" "When you get to the bottom line, this is a case of who you believe is telling the truth and who you believe is lying. If you believe

30

[Victim], then you must find the defendant guilty.  On the other hand, if you believe [Victim] is lying to you, you must find the defendant not guilty."

Philippe's defense did not exploit factual inconsistencies and raise doubts about the plausibility of the specific incidents of statutory sodomy; Philippe's defense was that the State did not meet its burden of proof because their only evidence was "just a 13-year-old girl's story," which the defense contended was probably a dream manifested by the wild imagination of a child, that morphed and snowballed because Victim wanted to get attention from adults who had their own sinister reasons for encouraging her "story." While Philippe contends he "went one-by-one through each incident and illustrated the inconsistencies with each story," Philippe references page numbers in the transcript but gives no examples, and we find any claimed inconsistencies were geared toward the defense theme that Victim's entire "story" is untrue.  Under plain error review, the appellant bears the burden of establishing manifest injustice. *State v. Brandolese*, 601 S.W.3d 519, 526 (Mo. banc 2020).  "It is not the duty of this Court to become an advocate for the appellant and comb through the entire record searching for the basis of claimed error." *State v. Bradley*, 8 S.W.3d 905, 906 (Mo. App. 2000).

The defense discussed that Victim wanted adult attention, and was trying to please adults by adding details to build her story.  The defense discussed that there were no witnesses to corroborate Victim's story.  The defense argued that J.B. was lying about not having an affair with Philippe, and the jury could use their common sense about her credibility.  The defense argued that the spy cameras set up by J.B. captured nothing,

31

because there was nothing to capture. Further, that J.B. not contacting the police immediately when Victim disclosed the abuse showed that J.B. knew she had nothing to actually worry about regarding Victim's safety, because J.B. knew the allegations were not true.

The defense argued the State only wanted the jury to hear certain chapters, and listed various witnesses the State chose not to call to testify, including J.B.'s sister, social workers, and police officers. The defense criticized the police for not attempting to recover surveillance footage from Philippe's indoor cameras, collect Victim's bedsheets, or dust for fingerprints. Further, Philippe argued nothing of evidentiary value was provided by medical professionals, and there was no DNA evidence. For those reasons, the defense argued, the State had not met its heavy burden to prove Philippe's guilt, and had "come up very, very short."

Defense counsel argued that it was hard to say why Victim made the allegations…whether she was "manipulated by [J.B.]," "had some vivid dreams," or if it was "somewhere in between." Counsel went on to describe how dreams might have confused Victim, J.B. then put ideas into her head, and "the imagination begin[s] to grow into reality." He argued the attention Victim received from J.B. caused Victim's story to grow, and J.B. put fuel on the fire. J.B. needed "the next person to mooch off of," and Victim's reports of abuse were J.B.'s way of getting her sister in Texas to take her in. The defense also posited that Victim did not like living in the Philippe household because Philippe's daughter put feces on her belongings, and Victim was not allowed to have

32

certain things other household members were allowed. "[Victim] was treated like an outsider in the home she lived in because she was, and Victim just wanted some attention from an adult in her life. And [J.B.] finally gave her that attention."

When discussing specific evidence, the defense focused on how the "stories snowball" and Victim had "different stories." Philippe did not rebut specific incidents with evidentiary inconsistencies and factual improbabilities, but rather generally denied that any of the alleged conduct occurred, and focused on possible inconsistencies in Victim's testimony.

While it is clear after having the benefit of closely reviewing the audio recordings, forensic interview, and trial transcript that there are two specific acts of penis to mouth sodomy in evidence, Philippe's defense argument actually supports that it was unclear whether there were multiple, distinct penis to mouth incidents. The defense argued:

> You've listened to her different stories. Which one is true? Was mommy taking a test on the first incident or was she taking a test on the second incident because that changes. Did he put it in her mouth one time or more than one time because that changes. Did he say, 'I want to show you something,' or did he say, 'I have a surprise for you,' because that changes. Was the first time when he put his privates in her mouth because that changes? Did she tell him 'No,' when he tried to do it again because that changes? And was it after this incident that he passed her that note, or was that a different time because that changes?

Moreover, the record as a whole sheds light on how the State, the defense, and the trial court neglected thirteen years of *Celis-Garcia* precedent and failed to distinguish between multiple acts in the verdict director, or direct that the jury be unanimous on at least one

33

distinguishable act of penis to mouth sodomy, because both the State and defense focused on credibility.

We find no manifest justice or miscarriage of justice based on Instruction No. 7, as there is no reasonable likelihood that individual jurors convicted Philippe on separate acts of penis to mouth sodomy.[3]

Point II is denied.

## Point III:  Instruction No. 6 – Mouth to Vagina Statutory Sodomy

In his third point on appeal, Philippe contends the circuit court plainly erred in submitting Instruction No. 6 on mouth to vagina statutory sodomy because there were multiple acts of mouth to vagina sodomy discussed in the evidence.  Philippe argues that the instruction submitted failed to differentiate between the multiple acts of mouth to vagina sodomy, thereby depriving him of a unanimous verdict.

Instruction No. 6 provided that the jury was to find Philippe guilty of statutory sodomy in the first degree if it found that, between April 1, 2019, and April 2, 2020, in the State of Missouri, Philippe knowingly had deviate sexual intercourse with Victim, a child less than fourteen years old, by placing his mouth on her genitals.  "Deviate sexual

---

[3]As is discussed in greater detail below, the jury found Philippe guilty of attempted enticement of a child.  Under that instruction, the jury was required to find that Philippe "repeatedly" asked Victim to place his penis in her mouth.  The jury convicted Philippe of that crime.  There were only two distinct incidents in evidence of Philippe asking Victim to place his penis in her mouth in evidence, and these are the same incidents which form the basis of the unanimity challenge to Instruction No. 7.  The jury's conviction on the attempted enticement charge, therefore, supports that the lack of specificity in Instruction No. 7 did not affect the jury's verdict.

34

intercourse" was defined for that instruction as any act involving the genitals of one person and the mouth of another person done for the purpose of arousing or gratifying the sexual desire of any person.

As to his claim of error regarding Instruction No. 6, Philippe simply argues that Victim's "testimony expressly demonstrates that this form of sodomy occurred in the bathroom and in the bedroom." Philippe goes on to argue that Victim testified that he put his mouth on her vagina the first time in the bathroom, and that he did the same multiple times in her bedroom, and that Victim "also claimed Philippe would place his mouth on her vagina while she was sleeping, presumably in her bed."

As discussed above, jury unanimity issues arise when there are multiple, *distinct* criminal acts in evidence, each of which could serve as the basis for a criminal charge, but the defendant is charged with those acts in a single count. *Celis-Garcia*, 344 S.W.3d at 155-56. When the victim describes a single, specific incident but indicates that the same or similar conduct occurred on multiple other occasions, no juror unanimity issues arise because the jury does not have an evidentiary basis to distinguish between acts that have not been discussed with particularity. *Adams*, 571 S.W.3d at 150 (where the victim reported in "very general terms' that the defendant licked her vagina on "repeated occasions" but "provided details about a single specific incident," the verdict director for that count "did not implicate [the defendant's] right to a unanimous verdict because the evidence did not describe multiple, distinct acts"); *see also State v. Tabberer*, 626 S.W.3d 274, 284-85 (Mo. App. 2021) (where the record disclosed "only one incident that was

35

discussed with particularity," there was "no reasonable likelihood that the jury could have been confused with regard to which specific incident of sexual intercourse the jury" agreed upon despite evidence that the same conduct occurred at other times and places because the victim "only spoke in generalities regarding" those other events).

Here, the after-shower incident where Philippe put his mouth on Victim's genitals was in evidence at trial through the audio recordings taken by J.B., testimony by the forensic interviewer, video recording of the forensic interview, and trial testimony by Victim. Victim stated that it occurred one time in the bathroom and described that incident with particularity. Victim testified that similar events occurred, "Multiple times in my bedroom." When asked to explain, Victim stated that Philippe would come into her room, and she did not know if she was wearing "my dress or pants, but he would like slide my underwear down and then put his mouth on my private—put his mouth on my private part." Or, he would put his private part in her mouth.

We find only one instance of mouth to vagina conduct discussed with particularity in the evidence. Because the evidence does not describe multiple, distinct incidents of mouth to vagina contact, Instruction No. 6 did not evidently, obviously, or clearly affect Philippe's right to a unanimous verdict. Further, even if the generic evidence of multiple instances of mouth to vagina conduct in conjunction with the one particularized incident warranted more specificity in the verdict director, for the reasons set forth above, Philippe has not established that the trial court's failure to *sua sponte* do so affected the

36

verdict. There is no reasonable likelihood that Instruction No. 6 allowed for individual jurors to convict on separate acts of mouth to vagina sodomy.

Point III is denied.

**Point IV: Instruction No. 9-Child Molestation by Touching Victim's Breasts**

In his fourth point on appeal, Philippe contends the circuit court plainly erred in submitting Instruction No. 9 on child molestation, arguing the instruction submitted failed to differentiate between which multiple acts of touching the breast of Victim occurred, and there were multiple acts of touching the breasts of Victim in different locations in the evidence, thereby depriving him of a unanimous verdict.

Instruction No. 9 provided that the jury was to find Philippe guilty of child molestation in the third degree if it found that, between April 1, 2019, and April 2, 2020, in the State of Missouri, Philippe touched the Victim's breast for the purpose of gratifying his sexual desire, and Victim was less than fourteen years old.

As to the claim of error regarding Instruction No. 9, Philippe argues that Victim's testimony "expressly demonstrates that this form of sodomy occurred in the bathroom and in the bedroom. [Victim] testified that Defendant put his mouth on her vagina and on her breasts the first time while they were in the bathroom." "She claimed he did the same multiple times in her bedroom." Philippe provides no further explanation in his opening brief, other than referencing page numbers in the transcript where this evidence is found. These page numbers refer to Victim's testimony regarding the after-shower incident. She states that Philippe "put his mouth on my private part, put his mouth on my boobs, and I

37

think that was it." She was asked, "And was that the only time that that had ever happened to you?" She testified "No." After stating that those things happened only once in the bathroom, she was asked how many times it happened in other places in the house. "Multiple times in my bedroom," she stated. When asked a few questions later to talk about those "other times in her bedroom," she mentioned only mouth to vagina contact and penis to mouth contact. She did not mention any breast contact. The evidence Philippe references, therefore, does not confirm that mouth to breast contact occurred multiple times in her bedroom, and even if it did, the only particularized incident is the after-shower incident.

Because the evidence does not describe multiple, particularized incidents of Philippe touching Victim's breasts, Instruction No. 9 did not evidently, obviously, or clearly affect Philippe's right to a unanimous verdict. Further, even if Victim's testimony supports multiple instances of breast touching, for the reasons set forth above, Philippe has not established that the trial court's failure to *sua sponte* submit a more specific verdict director affected the verdict. There is no reasonable likelihood that Instruction No. 9 allowed for individual jurors to convict on separate acts of breast touching.[4]

Point IV is denied.

---

[4]Because Philippe's claim fails as he presents it, we need not address the State's argument that Philippe was charged with touching Victim's breasts with his hands, not mouth, and because there were no multiple, distinct acts of hand to breast touching in evidence, only a generic account, there could have been no jury confusion. Philippe counters in his Reply Brief with a discussion that mouth to breast contact amounts to "touching," but still fails to explain, even if this is true, the multiple, distinct acts of breast touching in evidence.

## Point V:  Instruction No. 8-Attempted Enticement of a Child

In his fifth point on appeal, Philippe contends the circuit court plainly erred in submitting Instruction No. 8 on attempted enticement of a child, arguing the instruction submitted failed to differentiate between which multiple act of enticement occurred. Philippe argues there were multiple acts of enticement in different locations discussed in the evidence, thereby depriving him of a unanimous verdict.

Instruction No. 8 provided that the jury was to find Philippe guilty of attempted enticement of a child if it found that, between April 1, 2019, and April 2, 2020, in the State of Missouri, Philippe, age twenty-one or older, repeatedly asked Victim to place his penis in her mouth;  that, such conduct was a substantial step toward commission of the offence of enticement of a child by attempting to coax a person less than fifteen years of age to engage in sexual conduct, and, that Philippe engaged in that conduct for the purpose of committing such enticement of a child.

As to the claim of error regarding Instruction No. 8, Philippe simply states: "[Victim] testified as to events occurring in different locations and/or perhaps the same events occurring at two different dates separated by several months.  (Tr. 741; 750).  For the same reasons set forth in Argument II, Philippe should be afforded a new trial as to Count III."

As discussed in Point II, the evidence shows that Philippe placed his penis in Victim's mouth on more than one occasion, and although Victim stated that this happened numerous times, there were two distinguishable acts in evidence.  Philippe

39

references the pages of the trial transcript where Victim discusses these two, distinct events, in support of his claim that the attempted child enticement instruction, Instruction No. 8, required more specificity to ensure jury unanimity.

Although evidence of these two distinct acts of penis to mouth sodomy caused unanimity concerns with Instruction No. 7, the same concern is not present with Instruction No. 8 because it requires that Philippe "repeatedly" asked Victim to place his penis in her mouth. Philippe states in his Reply Brief that, "If there were only two instances, the State would be right that it assumed a higher burden," but argues that in the case of three or more instances, "the unanimity problem is compounded." Philippe, however, fails to point to more than two distinct instances in evidence.

Because the jury had to find that the attempted enticement occurred repeatedly, Instruction No. 8 did not evidently, obviously, or clearly affect Philippe's right to a unanimous verdict.

Point V is denied.

### Point VI – Improper Jury Communication

In his sixth point on appeal, Philippe contends the circuit court erred in overruling his motion for new trial. Philippe claims that the prosecutor entered the courtroom while the jury was viewing evidence, arguing that the State improperly communicated with the jury during its deliberation. Philippe contends that the testimonies of the prosecutor who allegedly engaged in improper communication, and a deputy who was not in the room,

were insufficient to overcome the presumption of prejudice of the improper communication.

The record shows that, during deliberations, the jury asked to view Exhibit 12 (J.B.'s recordings of Victim's disclosures) and Exhibit 14 (the videotaped forensic interview). The court made a record stating that they would "all vacate" the courtroom, and the bailiff would notify the jury that she was outside the door and that they could summon her help if needed.

In Philippe's motion for new trial, Philippe alleged the trial court erred in allowing the prosecutor to enter the courtroom for "a few minutes" while the jury was reviewing exhibits. At the hearing on Philippe's motion, defense counsel called a prosecutor to testify. The prosecutor testified that, after everyone else had left the courtroom and before the jury entered, he showed the bailiff how to play the exhibits. He then left the room. He returned to turn off the computer after he was informed the jury had finished watching the exhibits and had returned to the deliberation room. His testimony was that he had no contact with the jurors.

The bailiff testified that, "prior to bringing the jury into the courtroom," and while the jury was still in the deliberation room, the prosecutor showed her how to play the exhibits. The prosecutor left the room before the bailiff brought the jury in. The bailiff testified that no one but the jury was in the courtroom when they viewed/listened to the exhibits. When they were finished, they knocked on the security door, which was the same door they used to enter the courtroom. The bailiff then reentered the courtroom

41

where no one but the jury was present. The jury returned to the deliberation room. The bailiff then asked a woman to notify the prosecutor that the equipment needed to be turned off, because the bailiff did not know how to do it. The prosecutor returned after the jury was gone.

A defense attorney testified that Philippe told her that he saw one of the prosecutors walk into the courtroom during jury deliberations. The defense attorney asked the prosecutor about it, who in turn expressed aggravation at such an allegation and later sent a "scathing email." Defense counsel requested a phone conversation. During that conversation, the prosecution acknowledged how Philippe might have been led to that conclusion, stating that a prosecutor had entered the courtroom to do something with the computer, but the jury was not there at the time. Defense counsel testified that, up until that point, defense counsel had been unaware that the prosecution ever entered the courtroom during that time.

The trial court found that the account provided by the prosecutor and bailiff was "the correct recitation of the facts," and the bailiff's testimony, in particular, convinced the court that Philippe's claim of interference with jury deliberations "in fact, did not occur."

"The trial court has broad discretion in determining whether the State has demonstrated the harmlessness of improper jury contact." *State v. White*, 138 S.W.3d 783, 786 (Mo. App. 2004). "The primary, if not exclusive, purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence." *Id.* Private

communications between jurors and third persons are "absolutely forbidden" and "invalidate the verdict" unless the communications are shown to be harmless. *Id.* "Upon *prima facie* evidence of such communications or contact, the State has a burden of affirmatively showing that jurors were not improperly influenced." *Id.*

The circuit court did not abuse its discretion in overruling Philippe's motion for new trial. There is no evidence in the record that any improper communication or contact between the prosecutor and jurors occurred. The motion hearing evidence supplied an explanation for why Philippe observed a prosecutor enter the courtroom after the jury had retired for deliberations, and the court found credible the bailiff's testimony that the jury was not in the courtroom when the prosecutor entered to manage the exhibit computer. "[T]he court which hears the evidence concerning the allegedly improper contact [] is in the best position to determine the credibility of the evidence and the intent of the parties." *State v. Gray*, 741 S.W.2d 35, 40 (Mo. App. 1987).

Point VI is denied.

**Conclusion**

The circuit court's judgment is affirmed.

_____
Anthony Rex Gabbert,
Chief Judge

All concur.